793 A.2d 143

**Robert A. LEWIS, Linda S. Lewis, Husband and Wife, and Robert J. Lewis, Appellants,**

**v.**

**ERIE INSURANCE EXCHANGE, Appellee.**

Supreme Court of Pennsylvania.

Argued Sept. 11, 2001.

Decided March 21, 2002.

Todd Berkey, Pittsburgh, for Robert A. Lewis, et al.

John W. Pollins, Greensburg, for Pennsylvania Trial Lawyers Association.

Craig R.F. Murphey, Erie, for Erie Insurance Exchange.

Christine P. Busch, James C. Haggerty, Philadelphia, for Pennsylvania Defense Institute.

Before FLAHERTY C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

SAYLOR, Justice.

The question presented is whether technical requirements imposed upon insurers under the Motor Vehicle Financial Responsibility Act to effectuate a first named insured's decision to decline uninsured and underinsured motorist coverage also pertain in circumstances involving acceptance of coverage at designated policy limits.

In June of 1992, Appellants Robert A. and Linda Lewis contracted with Appellee, Erie Insurance Exchange ("Erie"), for automobile insurance coverage as named insureds. On the face of the declarations page (as of at least November, 1992), the policy provided, *inter alia*, bodily injury liability coverage limited to $500,000 per person and per accident; uninsured motorist ("UM") and underinsured motorist ("UIM") coverage with limits of $50,000 per person and $100,000 per accident; and stacking of UM and UIM benefits by virtue of multiple

vehicle premium payments. The UM/UIM coverage appears to have been modified in November of 1992 via a form provided by Erie and signed by Mr. Lewis as the first named insured. The single-page form is divided into two primary sections, each of which is separately outlined in box style prominently labeled as pertaining to "uninsured motorist coverage options" and "underinsured motorist coverage options," respectively. The two primary sections are each subdivided into three discrete, individually labeled blocks containing operative language to accomplish waiver or rejection of coverage; reduction of coverage limits; and/or rejection of stacked limits of coverage. Each of the three individual blocks within each primary section contains a line calling for the signature of the first named insured to effectuate selection of the option if chosen. Mr. Lewis's signature appears on the form in both the UM and UIM sections within the blocks labeled "Reduced Limits of [UM/UIM] Motorist Protection," and providing as follows:

> By signing this waiver, I am rejecting [UM/UIM] coverage limits equal to my bodily injury liability limits. I knowingly and voluntarily select uninsured motorist coverage limits lower than my bodily injury limits. Instead, I select the following limit(s):
>
> $50,000 EACH PERSON $100,000 EACH ACCIDENT . . .

No signature is present in any of the four blocks pertaining to waiver/rejection of UM and UIM coverage and stacking.

In July of 1997, the Lewises' son was injured in a motor vehicle accident while a passenger in a vehicle insured by a different company. Pursuant to provisions of the Erie policy extending coverage to resident relatives and affording a degree of portability in the UIM component, the Lewises' son was treated as a covered person thereunder, and Erie apparently conceded coverage limited to $100,000, after stacking, consistent with the declarations page of the policy. The Lewises, however, contended that the limits of available UIM coverage should be extended to the bodily injury liability limits ($500,000, and $1 million after stacking), since Erie's UM/UIM coverage options form failed to conform to Section

1731 of the MVFRL, 75 Pa.C.S. § 1731, governing the mandatory offering by insurers of UM and UIM insurance, and specifically the requirement of Section 1731(c.1) that an insurer must provide forms for waiver/rejection of such offerings printed on separate pages pertaining to each form of coverage waived. *See* 75 Pa.C.S. § 1731(c.1).[1] Erie disputed the applicability of Section 1731(c.1) in instances involving the selection of specific coverage limits rather than outright waiver/rejection. As relates to an insured's selection of particular limits, Erie identified Section 1734 of the MVFRL as the controlling provision, emphasizing that its provisions require only that a request for specific limits for UM/UIM coverage be in writing but contain no analog to Section 1731(c.1)'s separate-page requirement.[2]

In light of the dispute concerning available UIM coverage under the Erie policy, the Lewises commenced a declaratory judgment action in the common pleas court seeking a judicial affirmation of their position and a corresponding reformation of the policy's UIM limits. Erie defended the action and filed a motion seeking summary judgment. In response, however, the common pleas court treated the motion as one seeking judgment on the pleadings and granted relief, not for Erie, but rather, in favor of the Lewises. In its initial memorandum opinion, the court explained that the outcome was controlled

1. The pertinent text of Section 1731(c.1) is as follows:

   **Form of waiver.**—Insurers shall print the rejection forms required by subsections (b) and (c) on separate sheets in prominent type and location. The forms must be signed by the first named insured and dated to be valid. The signatures on the forms may be witnessed by an insurance agent or broker. Any rejection form that does not specifically comply with this section is void. If the insurer fails to produce a valid rejection form, uninsured or underinsured coverage, or both, as the case may be, under that policy shall be equal to the bodily injury liability limits. . . .

   75 Pa.C.S. § 1731(c.1).

2. The text of Section 1734 is as follows:

   A named insured may request in writing the issuance of coverages under Section 1731 (relating to availability, scope and amount of coverage) in amounts equal to or less than the limits of liability for bodily injury.

   75 Pa.C.S. § 1734.

by *National Union Fire Ins. Co. v. Irex Corp.,* 713 A.2d 1145 (Pa.Super.1998), in which a Superior Court panel indicated that an insurer must strictly comply with Section 1731 of the MVFRL as a prerequisite to a reduction in coverage under Section 1734. *See id.* at 1152–54.[3] On the basis of *Irex,* the common pleas court reasoned that a court must, as a threshold matter, ensure that the insurer provided forms meeting the technical requirements for the rejection set forth in Section 1731. Only then, if the requirements of Section 1731 are met, may the court proceed to determine whether an insured executed a valid written request to reduce coverage under Section 1734. Accordingly, because Erie failed to provide the Lewises with separate forms for rejection of UM and UIM coverage, the court concluded that Mr. Lewis's request for specific coverage limits was ineffective, and reformation was required pursuant to Section 1731(c.1). In a supplemental opinion, the common pleas court further explained that it had considered *Salazar v. Allstate Ins. Co.,* 549 Pa. 658, 702 A.2d 1038 (1997), and *Donnelly v. Bauer,* 553 Pa. 596, 720 A.2d 447 (1998), in which this Court determined that, although insurers had violated certain technical requirements of the MVFRL, since the Legislature had not prescribed pertinent remedies for such violations, none was available to the insureds. *See Salazar,* 549 Pa. at 669–70, 702 A.2d at 1044; *Donnelly,* 553

3. After considerable analysis, *Irex* concluded that:

one cannot validly elect to lower the limits of UM/UIM coverage pursuant to section 1734 without first being given the requisite notice of the availability of such coverage found within section 1731.

\* \* \* \* \* \*

We conclude that an insured cannot make a valid election to reduce UM/UIM statutory coverage limits under section 1734 unless and until the insured/applicant comports with the requirements set forth in section 1731.

\* \* \* \* \* \*

In order to validly elect lower UM or UIM coverage limits under section 1734, one must first validly elect such coverage by being given notice of the availability, scope and amount of coverage for UM/UIM benefits—again, this notice is specifically provided in section 1731. Thus, in order to effectuate a knowing and intelligent waiver of statutory UM/UIM benefits ... one must first comply with section 1731.

*Id.* at 1151 n. 4, 1153–54.

Pa. at 609–10, 720 A.2d at 453–54. The common pleas court distinguished these decisions on the basis that, since the 1990 amendments to the MVFRL,[4] reformation has been expressly required as a remedy for violation of Section 1731's separate-page requirement pertaining to UM/UIM waiver/rejection. *See* 75 Pa.C.S. § 1731(c.1) ("Any rejection form that does not specifically comply with this section is void[;][i]f the insurer fails to produce a valid rejection form, uninsured or underinsured coverage, or both, as the case may be, under that policy shall be equal to the bodily injury liability limits.").[5]

On appeal, however, a panel of the Superior Court reversed in a published opinion. *See Lewis v. Erie Ins. Exch.*, 753 A.2d 839 (Pa.Super.2000). The majority described the issue as "whether policies issued under § 1734 must comply with the technical requirements of § 1731 in order to effect a valid election of reduced UM/UIM coverages under § 1734." *See id.* at 846. In addressing this question, the majority provided a partial overview of the MVFRL, focusing upon: the legislative requirement for insurers to offer UM/UIM coverage, *see* 75 Pa.C.S. § 1731; Section 1731's prescription of technical requirements governing requests for waiver/rejection, including the single-page criterion prescribed by Section 1731(c.1); the directive for a specific, written request in order to specify applicable limits for UM/UIM coverage, *see* 75 Pa.C.S. § 1734; the general requirements respecting statutory language and formatting for notice of available benefits and limits, *see* 75 Pa.C.S. § 1791; and the separate statutory mandates governing disclosure of premium charges and tort options, *see* 75 Pa.C.S. § 1791.1. *See Lewis*, 753 A.2d at 842–46. Further, the court summarized this Court's opinions in *Salazar*, 549 Pa. at 658, 702 A.2d at 1038, *Rump v. Aetna Cas. & Sur. Co.*, 551 Pa. 339, 710 A.2d 1093 (1998), and *Donnelly*, 553 Pa. at 596, 720

4. *See* Act of Feb. 7, 1990, P.L. 11, No. 6 ("Act 6").

5. The common pleas court also distinguished the federal decisions in *Estate of Franks v. Allstate Ins. Co.*, 895 F.Supp. 77 (M.D.Pa.1995), and *Maksymiuk v. Maryland Cas. Ins. Co.*, 946 F.Supp. 379 (E.D.Pa.1996), as involving a separate segment of Section 1731(c.1) pertaining to policy renewals, as to which the General Assembly has not prescribed a remedy.

A.2d at 447, as well as various decisions of the Superior Court, culminating in a critical review of *Irex*. The majority distinguished *Irex* as involving a waiver/rejection paradigm as contrasted with Mr. Lewis's specific limits designation; therefore, it treated *Irex*'s directives precluding the designation of specific coverage limits in the absence of valid UM/UIM rejection forms, *see supra* note 3, as *dicta*. *See Lewis*, 753 A.2d at 849; *accord Lewis*, 753 A.2d at 855 (Brosky, J., concurring)("The panel in *Irex* was called upon to address only whether an invalid rejection form could be treated as a valid reduction request[;][t]he discussion by the panel of the interplay between sections 1791, 1731, and 1734 went beyond the question of whether an invalid rejection of UM and/or UIM coverage may be treated by the insurer as an election by the insured to reduce coverage under section 1734."). The majority then applied its own, plain-meaning interpretation of Section 1734, concluding that its requirement of a written request to implement specific UM/UIM coverage limits does not incorporate Section 1731's technical requirements, which apply solely to instances of outright waiver/rejection. *See Lewis*, 753 A.2d at 850–51 ("The plain meaning [of Section 1734] contains no standards concerning the language or form that a named insured uses to 'request in writing' the issuance of reduced UM/UIM coverages."). The court noted that its interpretation was also supported by the policy of the MVFRL to contain the rising costs of automobile insurance. *See id.* at 850 (quoting *Rump*, 551 Pa. at 345, 710 A.2d at 1096). Finally, the Superior Court majority also endorsed Erie's argument that the MVFRL does not provide a remedy under Section 1734. *See Lewis*, 753 A.2d at 851 (concluding that "when there is no explicit statutory remedy, we will not create one by judicial interpretation").

Judge Brosky authored a concurring opinion, in which he credited the majority for having undertaken a valid review of current insurance law decisions but also criticized its analysis in certain respects more pertinent to the case at hand, particularly in its treatment of *Irex*. *See Lewis*, 753 A.2d at 851 (Brosky, J., concurring). Nevertheless, Judge Brosky's two

essential points as concerned *Irex* aligned with the majority's assessment: he reasoned that *Irex*'s discussion of Section 1734 was errant *dicta* and that Section 1734 provisions as written, as well as the underlying policy, support the limitation of the technical requirements of Section 1731 to situations involving full waiver/rejection of UM/UIM coverage. Ultimately, the primary difference between Judge Brosky's concurrence and the majority opinion appears to be in his focus on the specific terms of the MVFRL as applied in the circumstances of the case.[6] We allowed appeal to consider the Superior Court's reasoning and associated conclusions.

**6.** After emphasizing that Mr. Lewis penned within the pertinent blocks of Eric's UM/UIM coverage form his specific limit requests, Judge Brosky explained:

The most important point to recognize in the present case is that it is a reduction case and not a rejection case. Despite the efforts of the insurer in *Irex* to cast that case in a different posture, *Irex* was a rejection case. Squarely addressing the question before us, the only applicant/insured who will be exercising the option to request reduced coverage for UM and/or UIM under section 1734 is one who has elected not to reject the coverage in its entirety under section 1731. As I see it, the remedy provision of section 1731 protects against the possibility of an uninformed rejection of coverage and recognizes that an insured may very well reject coverage where he would not have done so had he been fully informed of the consequences of his action. Not only are the same provisions not explicitly provided with respect to section 1734, but also the underlying concern is not presented. Whereas there may be a reasonable concern that coverage was rejected unknowingly, a person who reduces coverage must first "accept" coverage by choosing not to reject it, then must take an affirmative action to reduce the coverage. This requirement of taking an affirmative step of making a reduction request in writing, along with a designation of the coverage amount desired, provides adequate protection against a reduction request being made "unknowingly."

As illustrated by the present case, an applicant/insured may have been notified of the availability of UM and/or UIM coverages and the option of waiving such coverage, but not on separate pages, and still have decided to accept the coverage. This applicant/insured, armed with the knowledge of the available coverages, may make a knowing and intelligent decision to carry a reduced amount of coverage for UM and/or UIM. There is nothing in the MVFRL that requires the insurer to provide the insured with the bodily injury liability limits of the policy when the applicant/insured subsequently discovers that something was technically amiss with the rejection form that he decided not to sign in any event. As Judge Schiller observed [in his

Presently, the Lewises emphasize that the single-page coverage options form provided by Erie would unquestionably have been void under Section 1731(c.1) in terms of effectuating outright waiver/rejection of UM/UIM coverage had Mr. Lewis selected such options. The Lewises contend that the controlling question, then, is whether a form that is void for one purpose can be relied upon for another, in particular, to convey a viable Section 1734 specific limits request. According to the Lewises, such question is definitively answered by Section 1731(c.1)'s express admonition, not merely that the act of waiver/rejection is void, but that the form itself is void, *see* 75 Pa.C.S. § 1791(c.1) ("[a]ny rejection form that does not specifically comply with this section is void"), thus negating its effectiveness for any purpose and necessarily implicating Section 1731(c.1)'s remedy of reformation. *See id.* The Lewises find support for this interpretation in: the principle of statutory construction favoring the reading of related statutory provisions *in pari materia* (as did the *Irex* majority); the reasoning employed in this Court's recent decision in *Winslow–Quattlebaum v. Maryland Ins. Group,* 561 Pa. 629, 637, 752 A.2d 878, 882 (2000) ("In order to be valid, UM or UIM rejection forms must comply with the requirements of section 1731(c.1)," including, "the UIM rejection must appear on a sheet separate from the UM rejection."); and policy grounds related to fair notice, since, to validly elect lower UM or UIM coverage limits under Section 1734, a named insured must first be fairly apprised concerning the availability and scope of coverage. The Lewises dismiss as irrelevant the Superior Court's citations to *Salazar* and *Donnelly,* and point to other decisions of Pennsylvania appellate courts in which failure by an insurer to comply with the specific statutory requirements resulted in the provision of UM/UIM coverage extending to bodily injury liability limits.

Erie, on the other hand, initially stresses a series of negatives, in particular, that the Lewises do not deny that Mr.

dissenting opinion in *Irex* ], such a result would run contrary to the intent behind the MVFRL of curbing rising insurance costs.

*Lewis,* 753 A.2d at 856 (Brosky, J., concurring).

Lewis made an express, written request for specific UM/UIM coverage limits of $50,000 per person/$100,000 per accident; take issue with the wording of the forms signed by Mr. Lewis; or claim that Erie violated specific mandates of Section 1734. Further, Erie endorses the Superior Court's invocation of *Salazar* and *Donnelly*, contending that the affordance of relief in favor of the Lewises would be inconsistent with those decisions, as the Court has found remedies for violations of certain technical statutory criteria of the MVFRL unavailable in the absence of an express statutory prescription. In response to the Lewises' argument that the remedy may be found in Section 1731(c.1), Erie contends that a close review of such provision reveals that it provides a remedy only for improper "rejections" of coverage, and a request for coverage at specific limits is not a "rejection" within the contemplation of Section 1731. Since under Erie's view it is not attempting to enforce a rejection, the statutory language to the effect that "any rejection form that does not specifically comply with this section is void," 75 Pa.C.S. § 1731(c.1), is simply inapplicable. Moreover, according to Erie, the Lewises' present effort to obtain a benefit not purchased with or provided by the policy contravenes the cost containment goal of the MVFRL in that it would require an insurer to provide more coverage than was actually purchased, resulting in the attendant costs being passed along to other insurance consumers in the form of higher premiums. Finally, Erie cites to federal decisions that have applied reasoning in line with its arguments. *See Duncan v. St. Paul Fire and Marine Ins. Co.*, 129 F.Supp.2d 736, 740–42 (E.D.Pa.2001) (following the Superior Court's present decision in *Lewis* ); *Leymeister v. State Farm Mut. Auto. Ins. Co.*, 100 F.Supp.2d 269, 272–73 (M.D.Pa.2000) (stating that "there is no suggestion in the MVFRL that a request for lower limits of coverage is subject to the same requirements as a rejection of coverage[;][i]ndeed, had the legislature so intended, it could easily have done so").

Preliminarily, we express agreement in part with the Lewises' argument, and the position of the *Irex* panel, that Sections 1731 and 1734 should be read *in pari materia* at least

in the broadest sense, that is, as part and parcel of the MVFRL's comprehensive scheme for promoting financial responsibility in the motoring public and, more particularly, as relating to the provision of UIM coverage within the context of such scheme. *Cf. Salazar*, 549 Pa. at 663–64, 702 A.2d at 1041 (construing Sections 1731, 1791, and 1791.1 of the MVFRL *in pari materia*). In this regard, it is also significant to observe that the present formulations for both provisions were effectuated as part of the 1990 amendments to the MVFRL commonly referred to as Act 6, *see supra* note 4, and the provisions contain an internal cross-reference. *See* 75 Pa.C.S. § 1731(a) (referring to Section 1734 as relating to requests for UM/UIM limits lower than those pertaining to bodily injury liability). Manifestly, therefore, they were designed to be read together and according to their context within the guiding statutory framework of the MVFRL. *See generally* 73 AM.JUR.2D STATUTES § 103 (2001) ("Because the object of the rule [of construction *in pari materia*] is to ascertain and carry into effect the legislative intent, it proceeds upon the supposition that the several statutes were governed by one spirit and policy, and were intended to be consistent and harmonious in their several parts and provisions."). Accordingly, we begin with an overview of the MVFRL and its development, with emphasis on its prescription for UIM coverage.

Prior to 1984, basic motor vehicle insurance was required pursuant to the former No–Fault Motor Vehicle Insurance Act.[7] This represented the first comprehensive motor vehicle insurance enactment, promulgated with the express purpose of establishing a statewide system of basic loss benefits for accident victims at reasonable cost. *See* 40 P.S. § 1009.102(b)(repealed). The No–Fault Act embodied a principle known as "maximum feasible restoration" to accident victims, *see Paylor v. Hartford Ins. Co.*, 536 Pa. 583, 587, 640 A.2d 1234, 1235 (1994), manifested in provisions such as that which required unlimited medical coverage. *See* 40 P.S.

7. Act of July 19, 1974, P.L. 489, No. 176 (codified at 40 P.S. §§ 1009.101–1009.701) (repealed) (the "No–Fault Act").

§§ 1009.103, 1009.202 (repealed). The previously enacted UM Act codified the requirement of UM coverage in liability insurance policies under the previously existing fault system, *see Tubner v. State Farm Mut. Auto. Ins. Co.,* 496 Pa. 215, 220 n. 11, 436 A.2d 621, 623 n. 11 (1981), and was effectively integrated into the no-fault system. Under the UM Act, a motor vehicle liability policy issued in Pennsylvania and covering any vehicle registered or principally garaged in the Commonwealth was required to include coverage for the protection of persons insured under the policy who become legally entitled to recover damages from the owners or operators of uninsured vehicles, pursuant to provisions approved by the Insurance Commissioner. *See* 40 P.S. § 2000.

The No–Fault Act fueled rising insurance costs, particularly since insurers were required to provide a panoply of benefits, including unlimited medical coverage. *See generally Berger v. Rinaldi,* 438 Pa.Super. 78, 82, 651 A.2d 553, 554 (1994). In 1984, the General Assembly responded by implementing a new body of motor vehicle insurance law, the MVFRL, replacing the No–Fault Act and, as subsequently amended, embodying Pennsylvania's present scheme of motor vehicle insurance law. As is widely recognized, the primary concerns in repealing the No–Fault Act were the spiraling costs of automobile insurance and the resultant increase in the number of uninsured motorists. *See Windrim v. Nationwide Ins. Co.,* 537 Pa. 129, 136, 641 A.2d 1154, 1158 (1994). Among the many changes directed to this end, the MVFRL reduced unlimited medical coverage to a mandatory $10,000 minimum, reduced the amount of income loss benefits, and eliminated stacking of first-party benefits. *See Berger,* 438 Pa.Super. at 82, 651 A.2d at 554 (citing 75 Pa.C.S. §§ 1711, 1717, 1734). The MVFRL also required (and requires) that a vehicle owner show financial responsibility at the time of registration in terms of an ability (by way of insurance or otherwise) to respond to specified damages claims,[8] and subjects owners to penalties for failing

---

**8.** Specifically, financial responsibility under the MVFRL is defined as: [t]he ability to respond in damages for liability on account of accidents arising out of the maintenance or use of a motor vehicle in the

to maintain financial responsibility. *See, e.g.,* 75 Pa.C.S. § 1714 (providing that "[a]n owner of a currently registered motor vehicle who does not have financial responsibility . . . cannot recover first party benefits"); 75 Pa.C.S. § 1305(d)(rendering the failure to maintain financial responsibility a summary offense). Although the UM Act was not repealed, it was supplanted in some respects by the MVFRL, which contained its own requirement that UM coverage be provided. *See Hackenberg v. Southeastern Pa. Transp. Auth.,* 526 Pa. 358, 363 n. 4, 586 A.2d 879, 881 n. 4 (1991). The MVFRL also required UIM coverage to be included in all motor vehicle policies delivered or issued in Pennsylvania, with UM and UIM coverage in amounts equal to bodily injury liability coverage, unless the named insured made a written request for a lesser amount. *See* 75 Pa.C.S. §§ 1731, 1734 (superseded). Among other substantial revisions to the MVFRL that occurred in 1990,[9] also designed to enhance the ability of insurers to control costs, the General Assembly made the purchase of UM and UIM coverage optional, although insurers remained obligated to offer the coverage.[10] The

> amount of $15,000 because of injury to one person in any one accident, $30,000 because of injury to two or more persons in any one accident and in the amount of $5,000 because of damage to property of others in any one accident.
> 75  Pa.C.S. § 1702.

9.  *See* Act of Feb. 7, 1990, P.L. 11, No. 6.

10.  Section 1731(a) provides:
> (a) Mandatory offering.—No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverages are offered therein or supplemental thereto in amounts as provided in section 1734 (relating to request for lower limits of coverage). Purchase of uninsured motorist and underinsured motorist coverages is optional.
> 75  Pa.C.S. § 1731(a).
> The 1990 amendments also implemented changes specifically addressed to what many observers believed to be the root causes of rising insurance costs, namely, escalating health care costs and the increasing number of automobile tort lawsuits. *See Berger,* 438 Pa.Super. at 82, 651 A.2d at 555. These included election and application of the limited tort and full tort options, *see* 75 Pa.C.S. § 1705, and the creation of a peer review system for healthcare providers, *see* 75 Pa.C.S. § 1797.

enactment of and amendments to the MVFRL demonstrate a departure from the principle of maximum feasible restoration that was embodied in the No–Fault Act. *See Donnelly,* 553 Pa. at 606, 720 A.2d at 452; *Eichelman v. Nationwide Ins. Co.,* 551 Pa. 558, 564, 711 A.2d 1006, 1008 (1998) (citing *Rump,* 551 Pa. at 345, 710 A.2d at 1096); *Windrim,* 537 Pa. at 136, 641 A.2d at 1157–58 (citing Senate Journal, Oct. 4, 1983, 1142–53; House Journal, Dec. 13, 1983, 2139–59).

█ In setting forth the mandatory offer of UIM coverage, the General Assembly prescribed:

Underinsured motorist coverage shall provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of underinsured motor vehicles.

75 Pa.C.S. § 1731(c).[11] The provision was added to fill a void left by UM coverage, so as to provide individuals with indemnification in the event negligent motorists are not adequately insured for liabilities that they may incur.[12] Accordingly,

11. This provision mirrors Section 1731(b), pertaining to UM coverage. *See* 75 Pa.C.S. § 1731(b). The MVFRL defines "underinsured motor vehicle" as a "motor vehicle for which the limits of available liability insurance and self-insurance are insufficient to pay losses and damages," and "uninsured motor vehicle," *inter alia,* as a motor vehicle with no liability coverage. 75 Pa.C.S. § 1702.

12. As the Superior Court has explained:

claimants who purchased uninsured motorist coverage were in a better position when they were involved in a car accident with an uninsured tortfeasor rather than an underinsured tortfeasor. If they were hit by an uninsured tortfeasor, they could recover from their uninsured motorist benefits; however, if they were hit by an underinsured tortfeasor, they could not recover from that coverage but were limited to recovering the minimal amount of benefits available to them under the tortfeasor's insurance. The legislature enacted the underinsured motorist coverage in the MVFRL to resolve this anomaly.

*Newkirk v. United Services Auto. Ass'n,* 388 Pa.Super. 54, 58, 564 A.2d 1263, 1264–65 (1989); *see also Eichelman,* 551 Pa. at 564, 711 A.2d at 1008–09; *Paylor,* 536 Pa. at 587, 640 A.2d at 1235–36 (stating that the purpose of UIM coverage is " 'to protect the insured (and his additional insureds) from the risk that a negligent driver of another vehicle will cause injury to the insured (or his additional insureds) and will have inadequate liability coverage to compensate for the injuries caused by

together with UM coverage, UIM coverage serves to promote the recovery of damages for innocent victims of accidents with uninsured or underinsured drivers.

Thus, while recognizing the cost containment purposes associated with the MVFRL, it is important to maintain the perspective that the General Assembly has over the years preserved, and in some respects expanded upon, core remedial aspects from previously existing schemes. *See, e.g., Allwein v. Donegal Mut. Ins. Co.*, 448 Pa.Super. 364, 377, 671 A.2d 744, 751 (1996) (stating that "while 'maximum feasible restoration' may have passed out of favor the basic theory behind automobile insurance surely has not[;][t]he policy of liberally construing the MVFRL is based upon the policy of indemnifying victims of accidents for a harm they suffer on Pennsylvania highways"); ALAN I. WIDISS, UNINSURED AND UNDERINSURED MOTORIST INSURANCE 2d (rev.) § 35.4, at 165 (2001) ("In every state there is a general public interest in providing indemnification to individuals who have been injured in motor vehicle accidents."). Indeed, of particular significance to the present appeal, the Legislature plainly proceeded in this vein in 1990 with the promulgation in Act 6 of Section 1731(c.1)'s remedial provisions directed to assuring either that substantial UM/UIM coverage is provided to insured motorists in Pennsylvania or that an informed waiver/rejection is obtained in a uniform and particularized manner. *See supra* note 1.

In summary of the above, our review of Sections 1731(c.1) and 1734 is informed by their integration into a scheme for motorist insurance which has been adjusted to preserve the availability of core remedial aspects while also promoting, with increasingly greater emphasis, the containment of insurance costs. With this background, we consider the statutory terms as written, as they relate to each other, and in their context within the surrounding framework.

On the terms of Section 1731(c.1), the Lewises are (and the *Irex* panel was) correct in their assertion that it would be

his negligence' " (quoting *Wolgemuth v. Harleysville Mut. Ins. Co.*, 370 Pa.Super. 51, 58, 535 A.2d 1145, 1149 (1988))).

possible to read a segment of the statute, particularly in isolation, as requiring the production of a technically valid waiver/rejection form as a prerequisite to effectuating a specific-limits request. *See* 75 Pa.C.S. § 1731(c.1) ("Any rejection form that does not specifically comply with this section is void[;][i]f the insurer fails to produce a valid rejection form, uninsured or underinsured coverage, or both, as the case may be, under that policy shall be equal to the bodily injury liability limits."). The flaw in this interpretation, however, is that, in imposing a requirement for the production of a "valid" waiver/rejection form, the Legislature defined such a form as one that has been executed. *See* 75 Pa.C.S. § 1731(c.1) ("The forms must be signed by the first named insured and dated to be valid."). This favors interpretation of Section 1731(c.1) as addressing solely situations in which outright waiver/rejection is attempted, as contrasted with requests for specific limits under Section 1734. Otherwise, the above-quoted remedial provision of Section 1731(c.1) would, by its terms, require actual execution of a waiver/rejection form as an essential prerequisite to every Section 1734 specific-limits request. *See* 75 Pa.C.S. § 1731(c.1) ("If the insurer fails to produce a *valid rejection form* [, i.e., an executed form], uninsured or underinsured coverage, or both . . . shall be equal to bodily injury liability limits." (emphasis added)). The Lewises do not appear to advance such an interpretation, nor did the *Irex* panel, nor would this be a tenable reading in light of the unequivocal terms that must be employed to accomplish waiver/rejection and which would patently conflict with any attendant specific-limits designation.[13]

13. For example, the language which must be employed by insurers in UIM waiver/rejection forms is as follows:

REJECTION OF UNDERINSURED MOTORIST PROTECTION

By signing this waiver I am rejecting underinsured motorist coverage under this policy, for myself and all relatives residing in my household. Underinsured coverage protects me and relatives living in my household from losses and damages suffered if injury is caused by the negligence of a driver who does not have enough insurance to pay for all losses and damages. I knowingly and voluntarily reject this coverage.

75 Pa.C.S. § 1731(c).

Indeed, the *Lewis* panel's view of Section 1731 is by far the more natural one. Although the General Assembly clearly designed both Sections 1731 and 1734 as relating to UM/UIM coverage, it is just as plain that it directed each provision to a different form of election: Section 1731(c.1) to outright waiver/rejection of coverage, *see supra* note 1; and Section 1734 to selection of specific limits, *see supra* note 2. Section 1731's cross-reference to Section 1734 makes this distinction explicit in describing Section 1734 as "relating to request for lower limits of coverage." 75 Pa.C.S. § 1735(a). Therefore, although we view the statutes as *in pari materia* in a broad sense, the material difference in their subject matter allows for differential treatment to the extent that this would appear to be legislatively intended. *Accord* 1 Pa.C.S. § 1932 (prescribing for particularized treatment concerning statutes deemed *in pari materia* only where related to the same (or same class of) persons or things). In line with the *Lewis* panel's reasoning, this subject-matter distinction heightens the significance of the attachment of technical requirements and corresponding remedial provisions to Section 1731 waiver/rejection but not to Section 1734 specific-limits designation. *Accord Leymeister*, 100 F.Supp.2d at 272 ("The language of Section 1734 is clear on its face; all that is required to request lower limits of coverage is a writing requesting the same from a named insured.").

The character and degree of the difference in focus as between the statutes is relevant as well. As Erie posits, it is reasonable to conclude that the General Assembly attached the additional requirements to outright waiver/rejection to confer explicit warning upon consumers who chose to drive without any financial protection from injury on account of uninsured or underinsured motorists.[14] Further, as noted by

14. The United States District Court for the Middle District of Pennsylvania expressed similar thoughts as follows:

Section 1731(c.1) imposes something akin to strict liability on insurers who do not follow the legislature's guidelines on the proper format for rejection forms. . . . It is apparent that this strong corrective is designed to give the insurer the proper incentive to follow the legislature's prescription for avoiding uninformed choice on the part

Judge Brosky, requests for specific 'limits coverage, in contrast to outright waiver/rejection, require not only the signature of the insured, but also, an express designation of the amount of coverage requested, thus lessening the potential for confusion. Additionally, as concerns the Lewises' arguments regarding notice of the extent of available coverage, Section 1791 of the MVFRL occupies a central role as it concerns the conveyance of information regarding, *inter alia*, the insurer's obligation to offer UM and UIM coverage of up to at least $100,000 per person and $300,000 per accident, and of the insured's option to purchase coverage carrying lower benefit limits. *See* 75 Pa.C.S. § 1791. Indeed, by the terms of the statute, an insured's awareness of the benefits and limits available under the financial responsibility provisions of the MVFRL is presumed upon the provision of such notice, and "no other notice or rejection shall be required." *Id.*[15] The fact that notice may be presumed in certain situations involving the selection of specific-limits coverage although no Section 1731 waiver/rejection form is produced also favors the conclusion that Section 1731(c.1) serves a more limited and directed function than as a core notice provision pertaining to all UM/UIM requests.

In addition to its grounding in the plain language of the statute, as, again, all members of the *Lewis* panel concluded, Erie's position also draws support from the policies underlying the MVFRL. While cost containment is not the only objective of the statute, it has become an increasingly significant one, and it is apparent that the General Assembly has been employing the vehicle of free consumer choice with greater latitude and frequency in furtherance of this objective. Addi-

of purchasers of insurance. It does not necessarily follow, however, that because the legislature has decided such a strict measure is needed to protect consumers from unintelligently waiving all of their UM and UIM coverage, that the same measure must be applied in the less dramatically risky area of "waiver down."
*Leymeister,* 100 F.Supp.2d at 272.

**15.** We recognize that Section 1791 is not directly relevant at this juncture in the present case, since Erie has not included a Section 1791 notice as a part of the record. We therefore consider Section 1791 solely as part of our overall construction of the MVFRL.

tionally, we credit the observation of other courts to the effect that Section 1731(c.1)'s separate-page requirement is a technical one in the sense that essential notice of the consequences of waiver/rejection can be provided in absence of such prescribed formality. *See, e.g., supra* note 14.[16] Given this aspect of the requirement, and its correspondingly limited role in terms of furthering the remedial purposes of the statute, it is most reasonable to conclude that the Legislature intended its application to be limited according to its prescribed context. Finally, the Superior Court's determination is also in keeping with the plain-meaning reading of Section 1731 recently applied in *Winslow–Quattlebaum*, 561 Pa. at 629, 752 A.2d at 878, in which this Court unanimously determined that, in absence of a specific, statutory separate-page requirement, waivers of UIM coverage were not required to be made on a form separate from waivers of stacked UIM coverage. *See id.* at 636–37, 752 A.2d at 882.[17]

16. For example, as noted, Erie's form in the present case utilizes prominent typefacing, blocking, and subject-matter groupings which appear to be designed to convey the essential information in a fashion which would at least approximate the use of separate pagination.

17. The Lewises' contention concerning *Winslow–Quattlebaum, see supra,* overstates the significance of the Court's general paraphrase of Section 1731(c.1). Fundamentally, *Winslow–Quattlebaum* was an actual Section 1731 waiver/rejection case and simply did not concern a Section 1734 specific-limits designation. Similarly, contrary to the Lewises' arguments, the *Lewis* panel's analysis, and our conclusions here, are not in conflict with the decisions in *Lucas v. Progressive Cas. Ins. Co.*, 451 Pa.Super. 492, 680 A.2d 873 (1996), *Tukovits v. Prudential Ins. Co. of Am.*, 448 Pa.Super. 540, 672 A.2d 786 (1996), *Insurance Co. v. Miller*, 426 Pa.Super. 519, 627 A.2d 797 (1993), *Botsko v. Donegal Mut. Ins. Co.*, 423 Pa.Super. 41, 620 A.2d 30 (1993), and *Motorists Ins. Companies v. Emig*, 444 Pa.Super. 524, 664 A.2d 559 (1995). *Lucas* and *Emig* are distinguishable as they involved remedies conferred based upon an insurer's actual noncompliance with a mandatory provision of the MVFRL directly pertinent to the insured's claim. *See Lucas*, 451 Pa.Super. at 498–99, 680 A.2d at 876–77 (noncompliance with Section 1731 in a waiver/rejection paradigm); *Emig*, 444 Pa.Super. at 544, 664 A.2d at 569 (noncompliance with Section 1734 in a specific-limits case). *Tukovits, Miller,* and *Botsko* all concerned factual assessments as to whether a waiver or reduction was established in the absence of Section 1791 notice or written request for designated-limits coverage. *See Tukovits*, 448 Pa.Super. at 550, 672 A.2d at 791; *Miller*, 426 Pa.Super. at 526, 627 A.2d at 800; *Botsko,* 423 Pa.Super. at 48–49, 620 A.2d at 33.

We do acknowledge the correctness of the Lewises' observation that a specific limits request is akin to a partial waiver/rejection. Nevertheless, given the language and focus of the statutory provisions as discussed above, we decline to accord this point controlling significance in our assessment of the pertinent legislative intent.

In summary, the *Irex* panel incorrectly construed Section 1731 waiver/rejection as a prerequisite to Section 1734 specific-limits election. *See supra* note 3. The *Lewis* panel properly viewed this construction as *dicta* in relation to the disposition and took the opportunity to correct it. We hold, therefore, that the technical and remedial prescriptions of Section 1731(c.1), as such, apply solely in circumstances in which an insurer attempts to enforce outright waiver/rejection of UM/UIM coverage. Accordingly, Section 1731(c.1) does not impede enforcement of Mr. Lewis's Section 1734 specific-limits election, although multiple elections were accomplished on a single page, on which unrealized Section 1731(b) and (c) waiver/rejection language also appeared.

The Superior Court's order is affirmed.

Former Chief Justice FLAHERTY did not participate in the decision of this case.

Mr. Justice CAPPY concurs in the result.

---

Indeed, our only significant point of difference with the *Lewis* panel's reasoning is in its treatment of *Salazar*, 549 Pa. at 658, 702 A.2d at 1038, and *Donnelly*, 553 Pa. at 596, 720 A.2d at 447. Since our present reasoning concerns the non-applicability of the technical requirements of Section 1731(c.1) in a specific-limits paradigm, we do not consider the availability and extent of a remedy for an actual violation of the written-request requirement of Section 1734. We do note, however, that such prescription is less technical in nature, and more directly in line with the traditional application of ordinary contract principles in the consumer insurance arena, than Section 1731(c.1)'s separate-page requirement. *Cf. Tukovits*, 448 Pa.Super. at 550, 672 A.2d at 791; *Miller*, 426 Pa.Super. at 526, 627 A.2d at 800; *Botsko*, 423 Pa.Super. at 48–49, 620 A.2d at 33; *Emig*, 444 Pa.Super. at 544, 664 A.2d at 569.