

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-20-2006

# Nationwide Mutl Ins v. Merdjanian

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1790

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Nationwide Mutl Ins v. Merdjanian" (2006). *2006 Decisions*. Paper 436.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/436

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-1790
_____

NATIONWIDE MUTUAL  INSURANCE COMPANY


v.

ANDRE MERDJANIAN, Individually and as Administrator of the ESTATE OF SONA
T. MERDJANIAN, Deceased, HAGOP MERDJANIAN, and RAFFI MERDJANIAN,
Appellants
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(Civ. A. No. 03-5153)
District Judge: Honorable Michael M. Baylson
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 15, 2006
_____

Before: SLOVITER, WEIS, and GARTH, <u>Circuit</u> <u>Judges</u>

(Filed: September 20, 2006)
_____

OPINION
_____

Garth, <u>Circuit</u> <u>Judge</u>:

**I.**

Appellant Andre Merdjanian purchased an auto insurance policy from Appellee

Nationwide Mutual Life Insurance Company ("Nationwide") on July 16, 1990. The

policy, which took effect on July 17, 1990, provided bodily injury liability limits of

$25,000 per person and $50,000 per occurrence ($25,000/$50,000) and uninsured and

underinsured motorist coverage ("UM/UIM") of $15,000/$30,000. In the process of

applying for the policy, Merdjanian also signed an "Uninsured Motorist Coverage

Authorization Form," in which he selected UM/UIM coverage in the amount of

$15,000/$30,000. It is undisputed that this was the only form signed by Merdjanian

relating to UM/UIM insurance.

On August 26, 1998, Merdjanian added an additional vehicle to his policy, and

contemporaneously increased the limits of his liability coverage from $25,000/$50,000 to

$100,000/$300,000. In response, Nationwide mailed forms to Merdjanian giving him the

option of changing the limits of his UM/UIM coverage. The form pertaining to uninsured

motorist coverage stated: "Send this form . . .if you want to change the limits of your

Uninsured Motorist Coverage." The second form contained identical language with

respect to underinsured motorist coverage. Merdjanian concedes that these forms "were

never signed nor returned by him."

On April 17, 2001, Merdjanian met with Rocco J. Polidoro, an authorized seller of

Nationwide insurance, to add a third car to the policy. Merdjanian asserts that, at this

meeting, he requested "full coverage for my whole family." Merdjanian testified that he intended by this request to raise his UM/UIM coverage to the same coverage limit as his liability: $100,000/$300,000. It is undisputed, however, that he did not specifically ask Polidoro to increase his UM/UIM coverage and that he did not sign any forms requesting a change in his UM/UIM coverage. Nationwide subsequently issued a "Declarations Page" to Merdjanian, dated April 23, 2001, stating that his policy provided coverage of $100,000/$300,000 for liability and $15,000/$30,000 of UM/UIM coverage. Merjadian did not object to these coverage limits, and paid premiums for the coverage reflected in the April 23,2001 Declarations Page.

On June 10, 2001, Merdjanian's wife was killed, and his two sons injured, when an uninsured motorist struck one of the vehicles covered under his Nationwide policy.

## II.

Merdjanian and his two sons subsequently submitted a claim to Nationwide for UM/UIM benefits in the amounts of $300,000/$900,000.[1] In response, Nationwide filed a declaratory judgment action against Merdjanian requesting a declaration that the policy limited UM/UIM coverage to $15,000/$30,000 for all uninsured motorist claims arising out of the June 10, 2001 accident. Merdjanian responded with a counterclaim, seeking reformation of the Nationwide policy to reflect his entitlement to UM/UIM coverage of

---

[1]Merdjanian arrived at this figure by "stacking" the $100,000/$300,000 liability coverage the policy provided for each of his three vehicles. "Stacking" coverage allows an insured to combine the limits of per-vehicle coverage for all the vehicles on the policy to pay the loss from a single occurrence.

-2-

$300,000/$900,000.

Both parties moved for summary judgment. On March 7, 2005, the district court granted summary judgment in favor of Nationwide, holding that the Merdjanians' UM/UIM coverage was limited to $15,000/$30,000. We affirm.

**III.**

In this appeal, Merdjanian argues that, despite his signed authorization for only $15,000/$30,000 of UM/UIM coverage, Nationwide must nevertheless provide such coverage in the amount of $100,000/$300,000 under Pennsylvania's Motor Vehicle Financial Responsibility Law, 75 Pa.C.S.A. § 1701 et seq. ("MVFRL"). Merdjanian asserts that, pursuant to the MVFRL, any policy issued by an automobile liability insurer must provide UM/UIM coverage in an amount equal to the policy's liability coverage unless the insured has signed a valid coverage reduction form, agreeing to less than the maximum UM/UIM coverage-i.e., less than the policy's liability limit. Merdjanian claims that, although he signed such a form when he initially purchased the policy, his subsequent alteration of the policy, whereby he increased his liability coverage to $100,000/$300,000, triggered an obligation upon Nationwide to obtain a new signed confirmation that he wished to continue to waive maximum UM/UIM coverage. Merdjanian argues that, because he never signed such a form, Nationwide must provide the maximum UM/UIM coverage-i.e., the same $100,000/$300,000 worth of coverage his policy provides for liability.

## IV.

Section 1731(a) of the MVFRL provides, in pertinent part:

> No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverages are offered therein or supplemental thereto in amounts as provided in section 1734 . . .. ***Purchase of uninsured motorist and underinsured motorist coverages is optional***.

Id.

Sections 1731 (b), (c), and (c.1) provide the format of specific written forms to be signed by an insured who wishes to reject UM or UIM coverage entirely, as well as certain strict formalities that must be observed in executing these forms. Section 1731(c.1) also contains a penalty for insurers who fail to secure valid UM/UIM rejection waivers: "If the insurer fails to produce a valid rejection form, uninsured or underinsured coverage, or both, as the case may be, under that policy shall be equal to the bodily injury liability limits." Id. Section 1731(c.1) is essentially a penalty default imposed upon insurers who fail to procure the proper authorization from motorists who do not wish to purchase any UM/UIM coverage. See Lewis v. Erie Ins. Exch., 568 Pa. 105, 123 (Pa. 2002) (Section 1731(c.1) is designed to give insurers "the proper incentive to follow the legislature's prescription for avoiding uninformed choice on the part of purchasers of insurance.")

Motorists may also choose the intermediate option of purchasing UM/UIM

coverage in an amount less than their liability coverage. To obtain a reduced amount of UM/UIM coverage, an insured must only request it in writing. 75 Pa.C.S.A. § 1734. Section 1734 provides:

> A named insured may request in writing the issuance of coverages under section 1731 . . . in amounts equal to or less than the limits of liability for bodily injury.

Id.

Merdjanian's main argument is that when he increased his liability coverage to $100,000/$300,000 in 1998, Nationwide immediately became obligated to obtain a written confirmation that he wished to continue receiving UM/UIM coverage in a reduced amount. Nationwide did not do so. Merdjanian asserts that, just as failure to obtain a valid *rejection* form defaults UM/UIM coverage to the policy's liability limit, see id. § 1731(c.1), failure to obtain a writing confirming *reduced* UM/UIM coverage automatically defaults UM/UIM coverage to the limit of the policy's liability coverage.

This argument is without merit. Merdjanian's policy was issued in 1990 and continued in effect through the date of the accident in 2001. Nationwide fully complied with sections 1731 and 1734 by obtaining from Merdjanian, at the time he purchased the policy an "Uninsured Motorist Coverage Authorization Form," wherein Merdjanian agreed, in writing, to reduced UM/UIM coverage in the amount of $15,000/$30,000. Nothing in the statute requires an insurer to obtain a new writing under section 1734 each

time an insured chooses to increase liability coverage or otherwise alter the policy.[2] The statute requires only that an insurer offer UM/UIM coverage in the amounts specified in 1734 -i.e, in amounts less than or equal to liability coverage, and that the purchase of reduced coverage must be confirmed in writing. Id. §§ 1731, 1734.

That changes in the amount of liability coverage do not trigger additional requirements under the MVFRL is further confirmed by the language of section 1731, which applies specifically to the "*deliver[y] or issu[ance] for delivery*" of a "*liability insurance policy.*" Id. § 1731. It is therefore the initial issuance of a policy, rather than alteration of the policy's liability coverage limits, that triggers the MVFRL's requirements. It is true that section 1734 refers to "issuance of coverages." Id. § 1734. However, the Pennsylvania Supreme Court has held "that sections 1731 and 1734 should be read in pari materia." Lewis, 568 Pa. 105 at 115. Read together, sections 1731 and 1734 clearly impose obligations only with respect to the issuance of policies, not changes to pre-existing policies. Cf. Smith v. Hartford Ins. Co., 2004 PA Super 145 (Pa. Super. Ct. 2004) (holding that an increase in liability coverage does not trigger an obligation upon the insurer to obtain a new rejection of coverage form).

---

[2] Section 1791 of the MVFRL, which requires notice to insureds of available benefits and limits, provides that such notice must state ". . . payment of any renewal premium evidences your actual knowledge and understanding of the availability of these benefits and limits as well as the benefits and limits you have selected." It is significant in this regard that Merdjanian paid the renewal premiums on his policy from 1990, and particularly from 1998, through the date of the accident, without objecting to the coverages. Merdjanian's UM/UIM coverage continued to remain the same ($15,000/$30,000) from 1990 through the date of the accident.

Merdjanian's interpretation is further undermined by section 1791 of the MVFRL, which provides:

> It shall be presumed that the insured has been advised of the benefits and limits available under this chapter provided the following notice in bold print of at least ten-point type is given to the applicant at the time of application for original coverage, and no other notice or rejection shall be required:
>
> IMPORTANT NOTICE
> Insurance companies operating in the Commonwealth of Pennsylvania are required by law to make available for purchase the following benefits for you . . .
>
> . . . .
> (6) Uninsured, underinsured and bodily injury liability coverage. . .

Id.

Under section 1791, once an insurance applicant has been informed of the available choices for UM/UIM coverage, and opted to reject or reduce such coverage in conformity with the requirements of sections 1731 and 1734, the insurer has no further obligation to provide notice or rejection with regard to UM/UIM coverage. Here, Nationwide provided Merdjanian with the notice prescribed by section 1791 and obtained his written application for reduced UM/UIM coverage in the amount of $15,000/$30,000. Nothing more was required.

Merdjanian cites the recent Pennsylvania Superior Court en banc decision in Blood v. Old Guard Ins. Co., 894 A.2d 795 (Pa. Super. Ct. 2006) to support his contention that his altering of the policy's coverage limits obligated Nationwide to obtain

a new reduction waiver.  However, in <u>Blood</u>, the insured had been presented with a

"change request form" containing sections pertaining to both liability and UM/UIM

coverage.  This alone distinguishes <u>Blood</u> from the present case.  Moreover, <u>Blood</u> is not

a decision rendered by the Supreme Court of Pennsylvania.[3]  If it were,--and if it involved

facts and issues similar to those of the present case-- we, of course, would be bound by its

holding.  It is well-established that Pennsylvania inferior courts may influence our

decision if we are persuaded by their analysis.  We are not persuaded here that <u>Blood</u>

requires us to rule in favor of Merdjanian.

Even if applying for an increase in liability coverage would somehow trigger an

obligation on the part of an insurer to obtain a new writing confirming reduced UM/UIM

coverage, there is no basis for applying section 1731(c.1), which deals specifically with

failure to obtain a valid *rejection* form, to the *reduction* context at issue here.  The statute

treats complete rejection of UM/UIM coverage far more stringently than reduction by

specifying precise language to be included in a rejection form and by the other formalities

set forth in section 1731(c.1).  Section 1734, involving requests for reduced UM/UIM

coverage, contains no such provisions, requiring only a "request in writing."  <u>Id.</u> § 1734.

There is therefore no basis for importing Section 1731(c.1)'s penalty relating to rejections

into the reduction context.

These differences between complete rejection of UM/UIM coverage and opting for

---

[3]No decision of the Pennsylvania Supreme Court has dealt with the precise issue
before us.

reduced coverage are consistent with the policy underlying the statute, which is to protect consumers from unknowingly waiving their UM and UIM coverage. Lewis, 568 Pa. at 123. The Pennsylvania Legislature, clearly more concerned about the unknowing waiver of *all* UM/UIM coverage than a consumer's choice to purchase only a reduced amount of such coverage, logically chose to impose the severe penalty contained in section 1731(c.1)-i.e., increasing UM/UIM coverage to the liability limits, *only in the case of rejection*. For these reasons, Merdjadnian's claim that Nationwide must provide UM/UIM coverage in an amount greater than the $15,000/$30,000 for which he subscribed and paid premiums must be rejected.

Unlike rejection, the statute contains no penalty for violation of section 1734's requirement that requests for reduction be in writing. Under well-established Pennsylvania law, we are not empowered to create one. Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 642 (3d Cir. 2000); Donnelly v. Bauer, 553 Pa. 596, 608 (Pa. 1998); Salazar v. Allstate Ins. Co., 549 Pa. 658, 702 A.2d 1038 (Pa. 1997).

## V.

Merdjanian also argues that there is at least a factual dispute about whether, at the April 17, 2001 meeting, he requested that Nationwide increase his UM/UIM coverage to $100,000/$300,000. Merdjanian testified that, at this meeting, he told Polidoro that he wanted "full coverage for my whole family" and that by full coverage he meant UM/UIM coverage equal to the policy's liability coverage limit. However, it is undisputed that Merdjanian did not, at any point during this conversation or thereafter, state that he

desired an increase in his UM/UIM coverage. Nor did he execute the necessary forms to effect such an increase, despite the conceded fact that he received such forms from Nationwide.[4]

## VI.

For these reasons, we will affirm the district court's order granting Nationwide's motion for summary judgment.

---

[4]It is also significant that Merdjanian did not object to the Declarations Page mailed to him by Nationwide on April 23, 2001, which stated that his UM/UIM coverage remained $15,000/$30,000. Indeed, Merdjanian subsequently paid premiums for the coverage reflected in the April 23, 2001 Declarations Page.