

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-30-2004

# Fire & Cslty Ins Co v. Ligon

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-1283

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

## Recommended Citation

"Fire & Cslty Ins Co v. Ligon" (2004). *2004 Decisions.* Paper 1058.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1058

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-1283

FIRE & CASUALTY INSURANCE
COMPANY OF CONNECTICUT

v.

QUENTIN LIGON,

Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 01-cv-05300)
District Judge: Honorable Thomas N. O'Neill, Jr.

Submitted Under Third Circuit LAR 34.1(a)
October 30, 2003

Before: SCIRICA, Chief Judge, NYGAARD and AMBRO, Circuit Judges

(filed : January 30, 2004)

OPINION

AMBRO, Circuit Judge

Quentin Ligon appeals the decision of the District Court granting summary

judgment in favor of Fire & Casualty Insurance Company of Connecticut ("F&C"). In

October 2001 F&C filed a declaratory judgment action that sought to cap its obligation to Ligon for underinsured motorist benefits at $35,000. We have jurisdiction under 28 U.S.C. § 1291. For the reasons that follow, we vacate the decision of the District Court and remand this case for further proceedings.

I.

The dispute in this case arises from a motor vehicle accident that occurred on January 31, 2000. Ligon was operating a motor vehicle owned by his employer, Atlantic Express Transportation Group ("Atlantic"), and insured by F&C. He was rear-ended by another vehicle. Ligon settled with the vehicle driver's insurer for the policy limit of $100,000. Thereafter, Ligon sought coverage from F&C under the underinsured motorist provision of Atlantic's policy.

More relevant to this case, however, are the facts surrounding the issuance of Atlantic's insurance binder and after-issued policy. In December 1999, Atlantic was seeking to obtain automobile insurance for its operations in a variety of states. For this purpose, Atlantic employed an insurance broker, Capacity Coverage Company ("Capacity"). The insurance sought by Atlantic was a new policy. On December 23, 1999, Capacity faxed a binder of insurance coverage to Atlantic. The coverage period began December 31, 1999 and expired on February 29, 2001. The binder applied to all vehicles operated by Atlantic wherever located (except in Massachusetts). The binder listed the bodily injury liability limit as $1,000,000 and provided for "statutory" uninsured

2

motorist coverage.

At some unspecified time, Nathan Schlenker, Chief Financial Officer of Atlantic, signed an accord indicating Atlantic's election to limit underinsured motorist coverage to $35,000 in Pennsylvania. As discussed in more detail below, there are several apparent deficiencies with the accord.

On February 3, 2000 (after Ligon's accident), F&C issued policy no. AUT001884 providing coverage for Atlantic. An unsigned endorsement form attached to the policy sets the uninsured/underinsured motorist limits for Pennsylvania at $35,000.

II.

We exercise plenary review over a decision granting summary judgment. Witkowski v. Welch, 173 F.3d 192, 198 (3d Cir. Cir. 1999). In deciding a summary judgment motion, "the test is whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). We must also examine the evidence in the light most favorable to, and resolve all inferences in favor of, the non-moving party. Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 587 (1986).

III.

The insurance binder issued by F&C was an enforceable insurance document until canceled or replaced by a formal policy. The binder provided for "statutory" underinsured motorist coverage. Pursuant to Pennsylvania statute, underinsured motorist coverage is equal to the liability limits of a policy until or unless a lower limit is requested. And although Atlantic executed an accord — lowering underinsured motorist coverage to $35,000 — an issue of material fact exists as to *when* the accord was executed and *whether* it applies to the binder, the after-issued policy or both.

As to whether the binder issued by F&C is a valid insurance contract, "[i]t is well settled in Pennsylvania that a binder constitutes evidence that insurance coverage has attached at a specific time, and continues in effect until either the policy is issued or the risk is declined and notice thereof is given." Strickler v. Huffine, 618 A.2d 430, 433 (Pa. Super. Ct. 1992) (citing Harris v. Sachse, 52 A.2d 375, 378 (Pa. Super. Ct. 1947)); see also Springer v. Allstate Life Ins. Co., 731 N.E.2d. 1106, 1108 (N.Y. 2000).[1] "It is the custom of the insurance industry, and sound public policy, to provide on-the-spot

_____

[1] A federal court exercising diversity jurisdiction is to apply the choice-of-law rules of the forum state. Shuder v. McDonald's Corp., 859 F.2d 266, 269 (3d Cir. 1988). Under Pennsylvania law, an insurance policy is interpreted according to the law of the state where it was delivered. Crawford v. Manhattan Life Ins. Co., 221 A.2d 877, 880-81 (Pa. Super. Ct. 1966); see also Travelers Indem. Co. v. Fantozzi ex rel. Fantozzi, 825 F.Supp. 80, 84 (E.D. Pa. 1993). The insurance binder was delivered in New York. However, because Pennsylvania law does not differ from New York law on the relevant issues, and as this case involves interpretation of a Pennsylvania statute, we cite to cases from both jurisdictions.

4

temporary insurance coverage in the form of a binder until the application information can be verified and a formal policy issued." Klopp v. Keystone Ins. Cos., 595 A.2d 1, 4 n.5 (Pa. 1991). The "Conditions" section of the binder also provides that, absent notice of cancellation, the binder remains in effect until "replaced by a policy."

Legally the presumption is that the insurance binder issued by F&C provides $1,000,000 in underinsured motorist coverage. The binder states that underinsured motorist coverage is "statutory." The Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL")[2] requires insurers to offer uninsured and underinsured motorist coverage "equal to bodily injury liability coverage except where the insured, in writing, requests UM/UIM coverages in amounts less than the limits of liability for bodily injury purchased by the insured." Salazar v. Allstate Ins. Co., 675 A.2d 1259, 1262 (Pa. Super. Ct. 1996); accord 75 Pa. Cons. Stat. §§ 1731, 1734. A recent Pennsylvania case interpreting the term "statutory" in an insurance binder concluded that it unambiguously provided underinsured coverage in the amount of the policy's bodily injury liability limits. Peele v. Atl. Express Transp. Group, Inc., 2003 PA Super. 514 , ¶ 13.[3] Even if the term statutory is ambiguous, we generally must interpret the provisions of an insurance

---

[2] "Pennsylvania courts are unanimous that the legislative intent underlying the MVFRL was to establish a liberal compensatory scheme of underinsured motorist protection." Nationwide Mut. Ins. Co. v. Consensza, 258 F.3d 197, 208 (3d Cir. 2001).

[3] The facts in Peele are very similar to those in our case. In fact, both Peele and Ligon were employed by Atlantic at the time of their respective accidents. We also note that the District Court did not have the benefit of Peele. It was decided in December 2003, almost a full year after the District Court filed its opinion.

policy against the insurer and in favor of the insured. See, e.g., Jeffrey v. Erie Ins. Exchange, 621 A.2d 635, 638 (Pa. Super. Ct. 1993) (*en banc*); but see 12th Street Gym, Inc. v. Gen. Star Indem. Co., 93 F.3d 1158, 1166 (3d Cir. 1996) (stating "a court will only construe ambiguous language against the drafter in the absence of relevant extrinsic evidence" and that, in such a situation, the factfinder should normally resolve the ambiguity). Therefore, until or unless Atlantic made a written request to lower its underinsured motorist coverage, or until the insurance binder was replaced by an after-issued policy as to which Atlantic requested lower underinsured motorist coverage, Ligon was entitled to $1,000,000 in underinsured motorist coverage – the binder's bodily injury liability limit.

In addition, Ligon's rights under the insurance binder vested on January 31, 2000, the day of his accident. The replacement of the binder by the after-issued insurance policy (on February 3, 2000) cannot retroactively strip Ligon of these rights. See Peele, 2003 PA Super. 514 , ¶ 13 (rejecting argument that a request to lower underinsured motorist coverage under 75 Pa. Cons. Stat. § 1734 could be applied retroactively); see also Turley v. John Hancock Mut. Ins. Co., 173 A. 163, 165 (Pa. 1934) (concluding that an employee's subsequent discharge did not affect his rights under a disability insurance policy carried by his employer because the employee's rights vested [*i.e.*, he became disabled] prior to his termination); Bennacer v. Travelers Ins. Co., 695 N.Y.S.2d 846 (N.Y. App. Div. 1999) (finding that insurer was obligated to indemnify and defend

insured as to a matter that the after-issued insurance policy excluded coverage, but the binder was ambiguous as to coverage when the event in question occurred during the 30-day period during which the binder was effective); See also State Farm Mut. Auto. Ins. Co. v. Kendall, 122 S.E.2d 139, 143 (Ga. Ct. App. 1961) ("Rights against [an] insurer arise immediately upon the happening of the accident and cannot be destroyed by attempted subsequent cancellation, release or compromise by insured and insurer.").

Finally, although Atlantic CFO Nathan Schlenker executed an accord requesting to limit underinsured motorist coverage at $35,000, genuine issues of material fact remain. Specifically, it is unclear when the accord was executed and whether it applied to the binder, the after-issued insurance policy, or both.

As to when the accord was executed, the date "12/31/99" appears in the upper right-hand corner of the document. Based on this, and other extrinsic evidence of Atlantic's general intent, the District Court concluded that this was the date the accord was signed. Examination of the record, however, demonstrates that reasonable jurors could disagree with this conclusion. The date field next to Schlenker's signature is empty. While Schlenker executed a certification indicating the reduction in underinsured motorist coverage was requested knowingly and intelligently, the certification is silent on when the accord was signed. Further, F&C has failed to produce any evidence about when it received the accord. Nathan Lull, the President of Capacity, admitted in his deposition that Schlenker may have executed the accord after February 1, 2003.

7

Examination of the record also indicates that the "12/31/99" date may have been entered by Capacity (to correlate with the effective date of the binder) and then forwarded to Atlantic for execution. In addition, evidence in the record shows Schlenker and Lull may have been unaware of the Pennsylvania underinsured motorist scheme (and hence the need to request lower levels of underinsured coverage) in December 1999.

Based on the evidence in the record, an issue of material fact also remains whether the accord amends the insurance binder, the after-issued policy or both. The District Court's opinion focused on the record evidence indicating Atlantic's general desire to minimize coverage and thus insurance premiums. The accord itself, however, is silent as to what it amends. And as stated above, examination of the record indicates that at least Atlantic and Capacity — there is no evidence in the record from any F&C officer or employee — may not have possessed a full understanding of Pennsylvania's underinsured motorist scheme. Accordingly, they may have been unaware what the term "statutory" in the insurance binder even meant. Further, in contrast to the binder, the after-issued policy affirmatively limits underinsured motorist coverage in Pennsylvania to $35,000. Examining the available evidence in the light most favorable to and drawing all inferences in favor of Ligon, a reasonable jury could conclude F&C and Atlantic intended the accord to apply exclusively to the after-issued policy.

* * * * *

In this context, we vacate the decision of the District Court and remand this case

8

for further proceedings.

---

TO THE CLERK:

Please file the foregoing Opinion.

By the Court,

/s/ Thomas L. Ambro, Circuit Judge