

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-9-2005

# Fire & Cslty Co CT v. Cook

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-2564

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

## Recommended Citation

"Fire & Cslty Co CT v. Cook" (2005). *2005 Decisions.* Paper 248.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/248

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 04-2564

FIRE & CASUALTY COMPANY
OF CONNECTICUT,

Appellant

v.

MASON COOK

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civ. No. 02-cv-08409)
District Judge: Hon. Thomas N. O'Neill, Jr.

Argued: July 14, 2005

Before: SLOVITER, McKEE and WEIS, *Circuit Judges*,

(Opinion filed: November 9, 2005  )

ALAN C. MOLOTSKY, ESQ.  (Argued)
TRACEY N. KILCULLEN, ESQ.
Post & Schell
1600 J.F.K. Boulevard
Four Penn Center, 13th Floor
Philadelphia, PA 19103
*Attorneys for Appellant*

ROBERT W. SCHALL, ESQ.
PATRICIA D. BUCKLEY, ESQ.  (Argued)
Cooper & Schall
1760 Market Street, Suite 1100
Philadelphia, PA 19103
*Attorneys for Appellee*

OPINION

McKEE, *Circuit Judge*.

Fire & Casualty Company of Connecticut appeals the District Court's ruling that

Atlantic Express Transportation Group, did not request a reduction of its uninsured

motorist coverage in accordance with the requirements of Section 1734 of Pennsylvania's

Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 PA. CONS. ST. § 1701 *et*

*seq*. For the reasons that follow, we will affirm.

## I.

Mason Cook was employed as a driver for Atlantic Express Transportation Group,

a New York corporation. Atlantic Express was insured under a policy of a multi-state

commercial automobile insurance, policy AUTO1884, issued by Fire & Casualty. The

policy provided $1,000,000 in bodily injury liability coverage and, by an unsigned

endorsement, uninsured and underinsured motorist coverages (hereinafter "UM" and

"UIM", respectively)[1] in the amount of $35,000 for Pennsylvania-

---

[1]"Uninsured motorist coverage shall provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover from owners or operators of uninsured vehicles." 75 PA. CONS. STAT. § 1731(b). "Underinsured motorist coverage shall provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages from owners or operators of underinsured vehicles." 75 PA. CONS. STAT. § 1731©). An underinsured motor vehicle is "a motor vehicle for which the limits of available liability insurance and self-insurance are insufficient to pay losses and damages." 75 PA. CONS. STAT. § 1702.

"A person who recovers damages under uninsured motorist coverage or coverages

(continued...)

registered vehicles owned by Atlantic Express.

On May 1, 2001, while in the course and scope of his employment, Cook was operating a motor vehicle insured under the policy when he was involved in an accident with an uninsured motorist, and he thereafter made a claim for UM benefits under the policy. Fire & Casualty maintained that Cook was entitled to $35,000 in UM benefits. However, Cook claimed that he was entitled to UM coverage up to $1,000,000 – the amount equal to the bodily injury liability limits under the policy.[2]

Under the MVFRL, insurers who issue motor vehicle liability policies in Pennsylvania are required to offer their customers UM/UIM coverage in amounts equal to the bodily injury limits of the customers' polices. *Motorists Ins. Cos. v. Emig*, 664 A.2d 559, 561 (Pa.Super. 1995) (citing 75 PA. CONS. STAT. § 1791(6)). Indeed, Section 1731 of the MVFRL "mandates that an insurance company cannot issue a policy in the Commonwealth of Pennsylvania unless it provides UM/UIM coverage equal to the bodily injury liability coverage, except as provided in § 1734." *Nationwide Ins. Co. v. Resseguie*, 980 F.2d 226, 231 (3d Cir. 1992). However, the "[p]urchase of uninsured motorist and underinsured motorist coverages is optional." 75 PA. CONS. STAT. § 1731(a). An insured can reduce the amount of UM/UIM coverage below the policy's

---

[1](...continued)
cannot recover damages under underinsured motorist coverage or coverages for the same accident." 75 PA. CONS. STAT. § 1731(d)(1).

[2]Fire & Casualty has paid Cook the undisputed amount of the UM benefits – $35,000.

bodily injury limits, 75 PA. CONS. STAT. § 1734, or completely reject UM and/or UIM

coverage.  75 PA. CONS. STAT. §§  1731(b), ©).

We are concerned with § 1734 of the MVFRL.  That provision is encaptioned,

"Request for lower limits of coverage," and it provides:

> A named insured may request in writing the issuance of coverages under
> section 1731 (relating to availability, scope and amount of coverage) in
> amounts equal to or less than the limits of liability for bodily injury.

75 PA. CONS. STAT. § 1734.  "On its face, the only requirement of Section 1734 is that the

insured's request for reduced coverage be in writing," *Nationwide Mut. Ins. Co. v.*

*Heintz*, 804 A.2d 1209, 1215 (Pa.Super. 2002), and it appears that the writing may take

any form.  *Leymeister v. State Farm Mut. Ins. Co.*, 100 F.Supp.2d 269, 272 (M.D. Pa.

2002).[3]

---

[3]Unlike  the provision for reducing UM/UIM coverage, which requires only a writing by the insured, the MVFRL's provision relating to waiver or rejection of UM/UIM coverage is technical.  Section 1731(c.1) of the MVFRL requires that an insurer must provide forms for the rejection of UM and UIM coverage.  It provides, in relevant part:

> Insurers shall print the rejection forms required by subsections (b) and (c)
> on separate sheets in prominent type and location. The forms must be
> signed by the first named insured and dated to be valid.  The signatures on
> the forms may be witnessed by an insurance agent or broker.  Any rejection
> form that does not specifically comply with this section is void.  If the
> insurer fails to produce a valid rejection form, uninsured or underinsured
> coverage, or both, as the case may be, under that policy shall be equal to
> the bodily injury liability limits.

75 PA. CONS. STAT. § 1731(c.1).   The Pennsylvania Supreme Court has held that the

(continued...)

## II.

Nathan Schlenker is CFO of Atlantic Express and is responsible for securing the company's insurance. Schlenker signed a coverage selection form, dated December 31, 1999, in which he requested UIM coverage with limits of $35,000 in Pennsylvania for Atlantic Express. However, he did not request any reduction in UM limits on the coverage selection form. The applicable box to indicate that request was left blank.[4]

Schlenker verified that each year he would review policy limits and insurance premiums with Atlantic Express's insurance agent, Bob Lull of Capacity Coverage. More specifically, Schlenker reviewed the policy limits and coverages under policies with Lull. Fire & Casualty contends that Atlantic Express authorized (or empowered) Lull to act on Atlantic Express's behalf in procuring the policy involved in this dispute. Lull also verified that he was the agent involved in the production of the policy and that Atlantic Express gave him authority to act on its behalf in placing insurance with Fire & Casualty.

---

[3](...continued)
technical requirements and remedial prescription of § 1731(c.1) do not apply to requests to reduce UM/UIM coverage under § 1734. *Lewis v. Erie Ins. Exch.*, 793 A.2d 143, 155 (Pa. 2002).

[4]The coverage selection form contains boxes that must be checked to indicate the type of coverage desired and the amount of coverage. A box indicating that Atlantic Express desired liability coverage for bodily injury is checked and the amount of coverage desired is listed as $1,000,000. The coverage selection form also contains, *inter alia*, boxes to be checked for UM and UIM coverage and a space for the amount of coverage desired for each type of coverage. The box indicating UIM coverage is checked and the amount of UIM coverage desired is listed as $35,000. However, the box for UM coverage is not checked and there is no coverage amount indicated.

Fire & Casualty asserts that Lull was deposed in connection with another action related to the policy in question and that he there testified that he was Atlantic Express's insurance broker; and thus, its agent.[5] Lull verified that, in his capacity as Atlantic Express's insurance agent, he submitted requests for coverage, waited for quotes, evaluated bids for the desired coverage, and ultimately secured the coverage Atlantic Express desired and requested.

According to Lull, in the years that he serviced the Atlantic Express account, he reviewed the policy limits and insurance premiums with a representative of Atlantic Express for each state in which the company was insured, including Pennsylvania. Lull verified that it was the usual practice of Atlantic Express to select $35,000 for both its UM and UIM coverage in Pennsylvania.

Fire & Casualty contends that Schlenker was aware Atlantic Express could purchase greater amounts of UM/UIM coverage. However, Fire & Casualty alleges that Atlantic Express did not want UM coverage in an amount greater than $35,000. According to Fire & Casualty, Atlantic Express wanted to keep its commercial automobile insurance premiums as low as possible. Accordingly, Atlantic Express did not want to pay additional premiums in order to maintain UM/UIM coverage equal to the liability coverage offered under the policy.

---

[5]That action was *Fire & Casualty Ins. Co. of Connecticut v. Ligon*, No. 03-1283, 2004 WL 188328 (3d Cir. Jan. 30, 2004).

Lull verified that Schlenker signed the coverage selection form dated December 31, 1999, requesting UIM coverage with limits of $35,000 in Pennsylvania. However, as noted, Schlenker did not make any notation on the coverage selection form to reflect that Atlantic Express wanted to reduce its UM coverage to $35,000. Fire & Casualty claims that Lull nevertheless understood, based on his dealings with Schlenker and Atlantic Express, that the company wanted UM coverage identical to its UIM coverage. Fire & Casualty further claims that Lull also understood that Atlantic Express's goal was to keep its premiums for auto insurance as low as possible and that the company did not want to pay additional premiums to have UM/UIM coverage in amounts that equaled its liability coverage.

In his verification, Schlenker stated that although the coverage selection form does not specifically indicate the amount of UM coverage desired, Atlantic Express intended for the UM coverage to be identical to the UIM coverage, i.e., $35,000. Fire & Casualty alleges that Schlenker informed Lull of the company's intention in that regard.

Schlenker's verification further states that where he and Lull used the terms "statutory limits" or "basic limits," Schlenker understood those terms to mean UM/UIM coverage of $35,000. Lull's verification recites that he too understood that the terms "statutory limits" or "basic limits" signified UM/UIM coverage of $35,000.

Fire & Casualty contends that Lull's verification that Atlantic Express intended to secure $35,000 in UM coverage is further evidenced by a number of documents utilized

7

in the preparation of the insurance quote, proposal and binder. The insurance proposal prepared by Lull and Capacity Coverage, on Atlantic Express' behalf, was faxed from Capacity Coverage to Schlenker on December 23, 1999. It indicates that the proposed policy should carry "statutory" UM coverage. On December 22, 1999, an insurance quote was generated for the policy, and was sent from Transportation Writers, Inc., to Capacity Coverage. That document quotes a premium of $7.5 million for coverage that would include UM coverage "basic per state." Similarly, the primary pricing worksheet attached to Lull's verification indicates that UM/UIM coverage would be "statutory." Finally, a document sent to Atlantic Express by Matt Simnor, of Capacity Coverage, also indicates that "statutory" UM protection would be provided by the policy as issued.

Fire & Casualty contends that the policy, along with its attendant documentation, and the verifications, show that the premiums paid were for UM coverage in the amount of $35,000 for Pennsylvania. Lull, in his verification, stated that if Atlantic Express were to secure $1 million in UM coverage under the policy, its premiums would increase significantly.

Moreover, Lull executed a verification in connection with another case concerning the same policy[6] in which he verified that, "[a]t the time the policy in question was issued to Atlantic Express, December 1999, it would have cost approximately $75 per vehicle in Atlantic Express' nationwide fleet to increase [UIM] coverage from $35,000 to $1

---

[6]See n.6, supra.

million." He then calculated the approximate difference: "December 1999, there were approximately 5800 vehicles in the nationwide Atlantic Express fleet. Therefore, Atlantic Express would have had to pay, approximately, $435,000 in additional premiums in order to have increased its UIM coverage from $35,000 to $1 million."

Fire & Casualty claims that Atlantic Express never contested the amount of UM/UIM coverage provided under the policy. It also claims that neither Schlenker nor anyone else at Atlantic Express ever questioned the amount of UM coverage indicated in the proposal, quote, binder or policy. Moreover, Fire & Casualty notes that Cook is a stranger to the policy and to the negotiations leading to its issuance. Although Cook qualifies as an insured under the policy, he had no part in the selection of coverage limits under the policy.[7] Finally, Fire and Casualty notes that Cook has not presented any evidence discrediting or refuting the verifications offered by Lull or Schlenker or the deposition testimony offered by Lull.

**III.**

On November 12, 2002, Fire & Casualty filed a complaint seeking a declaration

---

[7] As we noted above, Fire & Casualty brought this suit as a declaratory judgment action to determine its obligation to Cook under the insurance policy with Atlantic Express. Cook, as an additional insured, is a "third-party beneficiary [and therefore] bound by the same limitations in the contract as the signatories . . . . [He] cannot recover except under the terms and conditions of the contract [of insurance]." *See* Dissent at 5 (quoting *General Accident Ins. Co. of American v. Sharp*, 665 A.2d 502 (Pa. Super. 1995). Accordingly, Cook clearly has standing to argue the extent of his coverage under the terms and conditions of that policy despite the concerns suggested by the Dissent.

that it is only obligated to provide $35,000 in UM coverage to Cook in connection with the May 1, 2001, automobile accident. Cook responded by contending that he is entitled to UM benefits in an amount equal to the coverage limits of the policy; $1 million.

Thereafter, Cook filed a supplemental memorandum of law in support of his cross-motion for summary judgment which centered around the Pennsylvania Superior Court's decision in *Peele v. Atlantic Express Transportation Group, Inc.*, 840 A.2d 1008 (Pa.Super. 2003).

The District Court entered an order denying Fire & Casualty's request for summary judgment and granting judgment in Cook's favor. The court ruled that Atlantic Express had not requested a reduction in UM coverage to $35,000 in writing. Therefore, the UM coverage was equal to the policy's bodily injury limit of $1,000,000. After some additional motions, this appeal followed.

**IV.**

As recited above, the District Court held that Atlantic Express had not made a "request in writing" to reduce UM coverage as required by § 1734 of the MVFRL. Accordingly, the court ruled that UM coverage was equal to the policy's bodily injury limits of $1,000,000. Because there is no reported decision by the Pennsylvania Supreme Court addressing the precise issue, the District Court was required to predict how the Pennsylvania Supreme Court would interpret § 1734 of the MVFRL under the facts of this case. *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000) (citation

10

omitted). In making that prediction, "a federal court can . . . give due regard, but not conclusive effect, to the decisional law of lower state courts." *Id.* (citation omitted). "The opinions of intermediate appellate state court are not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (citation and internal quotations omitted).

Our review is plenary. *See, e.g., Companie des Bauxites de Guinee v. Insurance Co. of N. Am.*, 734 F.2d 369, 371-72 (3d Cir. 1983). In predicting how the Pennsylvania Supreme Court would decide this case, we therefore consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980).

## V.

We consider each of Fire & Casualty's claims of error separately.

### A. Atlantic Express Intended that the Policy Carry only $35,000 in UM Coverage.

Fire & Casualty concedes that the coverage selection form that Schlenker signed does not request a reduction in UM coverage to $35,000 in writing. Given the mandate of the MVFRL, that really ends our inquiry. Nonetheless, Fire & Casualty argues that there is ample evidence that Atlantic Express intended that the UM coverage be limited to only $35,000. Schlenker did state that he intended UM coverage to be identical to UIM coverage and that he made Lull, Atlantic Express's insurance agent, aware of that. In

11

Fire & Casualty's view, "when considering whether an insured made a valid request for reduced limits of UM/UIM coverage, the focus is on whether there is any written evidence of the named insured's intention to reduce UM/UIM limits to a specific amount." Fire & Casualty's Br. at 16. Put another way, Fire & Casualty contends that Atlantic Express's intention to request reduced UM coverage of $35,000 satisfies the statutory requirements of § 1734.

We disagree. As noted, § 1734 of the MVFRL provides that "[a] named insured may request in writing" UM coverage that is less than the limits of the policy's bodily injury liability limits. Clearly, Schlenker did not make a written request for reduced UM coverage, and nothing in § 1734 allows the insured's intention to substitute for the statute's requirement that the request be made "in writing." Moreover, Pennsylvania's Statutory Construction Act prohibits that very result. *See* 1 PA. CONS. STAT. § 1921(b) ("When the words of the statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."). Moreover, the Pennsylvania Superior Court has held that in the absence of a written request from the named insured, the insured's alleged selection of reduced UM/UIM coverage is a nullity. *Emig*, 664 A.2d at 569. Finally, we note that the Pennsylvania Supreme Court has said, albeit in dicta, that "requests for specific limits coverage [under § 1734], in contrast to outright waiver/rejection [under § 1731], require not only the signature of the insured, but also an express designation of the amount of coverage requested, thus lessening the potential for

confusion." *Lewis v. Erie Ins. Exch.*, 793 A.2d 143, 153 (Pa. 2002).

Fire & Casualty next argues that even if we must ignore Schlenker's verification of his intent, writings prepared and submitted by Lull have the same effect because Lull was acting as Atlantic's agent. Those writings purportedly consist of: (1) an insurance proposal prepared by Lull which indicates that the policy should carry "statutory" UM coverage; (2) an insurance quote generated by Transportation Underwriters, Inc., and sent to Capacity Coverage,[8] which quoted a premium of $7.5 million for coverage that would include UM coverage "basic per state";[9] and (3) a primary pricing worksheet prepared by Capacity Coverage which indicated that UM/UIM coverage would be "statutory."[10] In Fire & Casualty's view, these three "writings" satisfy the "in writing" requirement of §1734.

Fire & Casualty further argues that both Schlenker and Lull verified that they intended the terms "statutory" and "basic" to mean $35,000. Therefore, Fire & Casualty argues that, when the three "writings" and Schlenker's and Lull's understanding of the

---

[8]As noted, Lull worked for Capacity Coverage. Fire & Casualty claims that there is a principal/agent relationship between Atlantic Express and Lull.

[9]Cook contends that since this document was created by Transportation Writers, the insurer's agent, it cannot be considered a writing of Atlantic Express or its agent.

[10]Cook says that the insurance quote was not prepared by Capacity Coverage. Rather, he claims it was prepared by Special Risk Underwriting Managers, Inc., Fire & Casualty's own underwriter. Therefore, the insurance quote cannot be considered a writing from Atlantic Express or its agent, Lull. Given our holding, we need not address that contention.

terms "statutory" and "basic" are considered, the requirements of § 1734 are met, and

UM coverage under the policy must therefore be limited to $35,000.

We again disagree. Section 1734 plainly says that the "insured may request in

writing" lower UM coverage. Yet, none of the three "writings" referred to by Fire &

Casualty are from Schlenker or anyone else from Atlantic Express. Therefore, we do not

think the Pennsylvania Supreme Court would allow the "writings" here to satisfy the

statutory requirement that the writing be the insured's.[11]

More importantly, however, Fire & Casualty's argument ignores *Peele v. Atlantic*

*Express Transportation Group, Inc.*, 840 A.2d 1008, 1013 (Pa.Super. 2003). There, the

Pennsylvania Superior Court held that the term "statutory" in an insurance binder is

unambiguous and means that "statutory" UM/UIM coverage is the same as the bodily

injury limits.[12] Therefore, the fact that Lull and Schlenker may have believed that

---

[11]Fire & Casualty contends that Lull, in his capacity as Atlantic Express's agent, can make a written request to reduce UM coverage on Atlantic Express's behalf. However, we note that the Pennsylvania Superior Court's decision in *Emig*, 664 A.2d at 565, casts some doubt on whether an agent's completion of a form satisfies the statutory requirement for a written request by an insured.

[12]The fact that *Peele* involved a binder and not the policy itself is of no consequence. "It is the custom of the insurance industry, and sound public policy, to provide on-the-spot temporary insurance coverage in the form of a binder until the application information is verified and a formal policy issued." *Klopp v. Keystone Ins. Co.*, 595 A.2d 1, 4 n.5 (Pa. 1991). Under Pennsylvania law, a "binder constitutes evidence that insurance coverage has attached at a specific time, and continues in effect until either the policy is issued or the risk is declined and notice thereof given." *Strickler v. Huffine*, 618 A.2d 430, 433 (Pa.Super. 1992).

14

"statutory" UM coverage means $35,000 is of no consequence. Under the MVIRL, the issue is not what the parties actually intended or believed. Rather, the issue is whether the insured complied with the statutory prerequisite for reducing its coverage. Therefore, it is inaccurate to suggest that the "additional insured, third-party beneficiary" is overriding the coverage determination of the named insured or that the additional insured is being given "rights superior to those of the named insured." *See* Dissent at 8. The insured's coverage determination is not being overriden by Cook, but by the formalistic requirements of controlling state law.

## B. The District Court's Refusal to Consider Extrinsic Evidence Was Error.

For the same reason, we reject Fire & Casualty's contention that the District Court erred by refusing to consider extrinsic evidence that establishes that Atlantic Express intended to limit UM coverage to $35,000. According to Fire & Casualty, Pennsylvania law supports the use of extrinsic evidence to clarify the intentions of the parties to a contract where a term of the contract is ambiguous. Fire & Casualty thus argues that the verifications of Lull and Schlenker, and the "writings" referred to above, "overwhelmingly supports the conclusion that the parties[13] desired, requested and received $35,000 in UM coverage." Fire & Casualty's Br. at 31. This is really merely a restatement of the argument we have rejected above.

---

[13]The "parties" to whom Fire & Casualty refers are Atlantic Express and Fire & Casualty.

15

Under Pennsylvania law, "[a]n ambiguity exists when the questionable term or language, viewed in the context of the entire policy, is reasonably susceptible of different constructions and capable of being understood in more than one sense." *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 363 (3d Cir. 2004) (citation and internal quotations omitted). However, the policy is not ambiguous. Again, the issue is whether Atlantic Express complied with the statutory requirements of § 1734 of the MVFRL to reduce UM coverage to an amount less than the policy's bodily injury liability limits. Atlantic Express's efforts to get us to focus on its intent require us to close our eyes to the statutorily prescribed method for expressing that intent. We obviously can not do that. Thus, extrinsic evidence of Atlantic Express's intent is irrelevant.

### C. The District Court Was Not Authorized to Reform the Policy.

Fire & Casualty argues the District Court erred by "reforming" the policy to provide UM coverage equal to the policy's bodily injury limits. According to Fire & Casualty, this was error because there is no remedy provided for under the MVFRL for noncompliance with § 1734. In making this argument, Fire & Casualty compares § 1734 with § 1731.[14] It says:

> A comparison of the language of § 1734 and § 1731 reveals that the legislature treated the outright rejection fo UM/UIM coverage in a remarkably different fashion than it treated the option to elect reduced limits of such coverage. Section 1734 is a simple one paragraph passage

---

[14]*See* n.4, *supra*.

16

requiring only a generic, non-specific written request by a named insured to effectively reduce the UM/UIM coverage afforded by a policy. Section 1731 stands in stark contrast to § 1734. Indeed, § 1731 includes an express directive as to the language that must be issued to waive inclusion of UM/UIM coverage in an auto policy issued in the Commonwealth. Section 1731 also includes a sub-paragraph dedicated to explaining the remedies available where an insurer fails to comply with the detailed mandates of § 1731. Such a provision is conspicuously absent from § 1734.

Fire & Casualty's Br. at 38. Fire & Casualty relies on the fact that section 1731(c.1) provides that failure to comply with its provisions for rejection results in UM/UIM coverage equal to the policy's bodily injury limits, while § 1734 does not say that failure to comply with its results in coverage equal to the policy's bodily injury limits. Fire & Casualty then notes that the MVFRL does not provide a remedy for failure to comply with section 1734's procedure for reducing UM/UIM limits. Consequently, Fire & Casualty views the District Court's ruling as a reformation of the policy to provide that UM coverage is the same as the bodily injury liability limits.

To support that argument, it cites to *Lewis v. Erie Ins. Exch.*, 793 A.2d 143 (Pa. 2002), where the Pennsylvania Supreme Court held that the "technical and remedial prescriptions of Section 1731(c.1), only apply when an insurer attempts to enforce outright rejection/waiver of UM/UIM coverage," but does "not impede enforcement of [the insured's] Section 1734 specific-limits election."

However, in making this argument, Fire & Casualty once again ignores *Peele v. Atlantic Express Transportation Group, Inc.*, 840 A.2d 1008 (Pa.Super. 2003). There, Peele and Sylvester were injured in two separate automobile accidents while employed as

17

paratransit drivers for Atlantic Express. Sylvester's accident occurred on February 22, 1999 with an uninsured driver. Peele's occurred on March 22, 1999 with an underinsured driver. Sylvester and Peele made claims for UM and UIM benefits, respectively, against Kemper Insurance Company, which insured Atlantic Express. Kemper tendered $35,000 each to Sylvester and Peele, claiming that was the amount of coverage for UM/UIM benefits under the policy issued to Atlantic Express. Sylvester and Peele filed a declaratory judgment action in state court seeking a declaration that the applicable UM/UIM limits were $2,000,000 for each claimant – the amount of the policy's bodily injury liability limits. Following a non-jury trial, the state trial court held that UM/UIM coverage was equal to the bodily injury liability limits.

On appeal, the Pennsylvania Superior Court began its analysis by reciting the relevant facts as found by the state court:

> Atlantic employed AON Risk Services of Missouri [AON], an insurance broker, to obtain the commercial insurance. On or about December 22, 1998, AON presented an Insurance Proposal to Atlantic, which summarized the various coverages that would be provided in all states in which Atlantic conducted business. For "Business Automobile," the limits were listed as **$2,000,000** in **liability** coverage and **"statutory" UM/UIM** coverage. Under "Coverage Modifications... By specific endorsement to the policy," there were 16 types of endorsements listed; however none of them applied to a reduction or rejection of UM/UIM coverage. Based on the coverages outlined in the Proposal, Atlantic authorized AON to bind this insurance. On or about December 29, 1998, AON delivered three binders to Atlantic at its offices in New York, reflecting placement of Atlantic's general liability, worker's compensation and commercial automobile insurance for every state in which Atlantic conducted operations. Binder No. 11544 applied to Atlantic's business coverage and indicated that temporary commercial automobile insurance had been obtained from

18

Lumberman's Mutual Casualty in accordance with the Insurance Proposal. The binder indicated a liability limit of $2,000,000 and referenced an Addendum for additional coverages under the binder. The Addendum listed the limits of UM/UIM coverage as "statutory" for every jurisdiction in which Atlantic operated, including Pennsylvania. Like the proposal, the Addendum contained a section delineating 16 coverage modifications by specific endorsement to the policy. None of the 16 endorsements related to a rejection of UM/UIM coverage or to a reduction of the limits of this coverage...

After the binder became effective in December 1998, the Sylvester and Peele accidents occurred--in February and March of 1999. On April 21, 1999, the Chief Financial Officer of Atlantic returned a signed copy of the "Final and Accepted Insurance Proposal" to Kemper. At this time, under the Policy Specifications, Limits of Liability, Uninsured Motorists, the limits of coverage for all states in which Atlantic operated was listed, for the first time, as "**Minimum Statutory** without rejecting (no stacking of limits)."

Finally, on June 24, 1999, AON forwarded to Atlantic various forms in connection with the Kemper insurance policy. Among these forms were requests to reject or reduce UM/UIM coverage in all states where such reduction or rejection was possible, including Pennsylvania. Atlantic returned these forms to AON on or after July 20, 1999. For the first time, Atlantic indicated in writing a selection of a specific limit of $35,000 applicable to Pennsylvania UM/UIM coverage. A written request for lower UM/UIM coverage limits is authorized in Pennsylvania by 75 Pa.C.S.A. § 1734.

840 A.2d at 1010-11 (footnote omitted)(emphasis in original).

Based on these facts, Kemper argued that the trial court erred in "reforming" the policy to provide more than the requested $35,000 UM/UIM coverage limit. It contended, *inter alia*, that the binder's terms were retroactively lowered by the request for lower limits submitted in April and June 1999. Sylvester and Peele argued, *inter alia*, that the lower limits of coverage did not take effect until after their accidents, when

19

the final UM/UIM policy revisions were signed and returned to Kemper.

The Superior Court agreed with Sylvester and Peele. It first quoted the state court's holding approvingly:

> The December 1998 binder in this case provided for "statutory" UM/UIM coverage. The trial court held that this term was unambiguous, and referred to the statutory language of 75 Pa.C.S.A. § 1731, which requires that insurers offer UM/UIM coverage to their insureds, and if such coverage is rejected by the insureds, the rejection must be in writing in accordance with the forms set forth in the statute. 75 Pa.C.S. § 1731(a), (b), ©). Furthermore, the statute provides that if a proper rejection is not obtained by the insurer, "uninsured or underinsured coverage, or both, as the case may be, under that policy shall be equal to the bodily injury liability limits." 75 Pa.C.S. § 1731(c.1). In this case, the bodily injury liability limits were $2,000,000. The trial court thus held that, in the absence of a properly executed UM/UIM rejection, the initial binder provided "statutory" UM/UIM coverage limits of $2,000,000.

840 A.2d at 1011-12. It next held:

> Furthermore, we note that appellant's argument regarding "minimum" statutory limits fails for an additional reason: there are no "minimum" limits of UM/UIM coverage in Pennsylvania. Although UM/UIM coverage must be *offered* to insureds, "[p]urchase of uninsured motorist and underinsured motorist coverages is optional," as long as it is properly rejected. 75 Pa.C.S. § 1731(a).

*Id.* at 1012 (emphasis in original). The Superior Court then concluded:

> We therefore reject appellant's claim that the trial court "reformed" the policy in this case. On the contrary, the trial court applied the unambiguous terms of the insurance binder, which was in effect at the time of the appellees' accidents, to provide coverage in the amount of the bodily injury liability limits. Until June 1999, when Atlantic expressly requested lower limits, there had been neither rejection of UM/UIM coverage pursuant to 75 Pa.C.S. § 1731 nor a written request for lower limits under 75 Pa.C.S. § 1734, and the terms of the December 1998 binder regarding "statutory" limits controlled the amount of UM/UIM coverage available to appellees.

*Id.* at 1013.

*Peele* thus demonstrates that the District Court did not "reform" the policy at all. Rather, that court merely held that the actions that purportedly expressed an intent to lower policy limits were legally insufficient to do so under § 1734. Thus, rather than reforming the policy, the District Court enforced it as written and held that absent compliance with § 1734, the policy limit was the "statutory limit" for bodily injury limits in Pennsylvania; $1,000,000.[15]

Fire & Casualty appears to suggest that an insured's failure to request lower UM limits in conformity with § 1734 does not mean that the UM coverage is therefore equal to the policy's bodily injury limits. However, that argument ignores Pennsylvania law. For example, in *Motorists Ins. Co. v. Emig*, 664 A.2d 559 (Pa.Super. 1995), the Pennsylvania Superior Court quoted approvingly from our decision in *Nationwide Ins. Co. v. Resseguie*, 980 F.2d 226, 231 (3d Cir. 1992):[16]

---

[15] Our holding does not, of course, mean that Cook receives a "windfall." He must still prove damages. The higher policy limit obviously does not entitle him to compensation for damages that he cannot prove.

[16] In *Resseguie*, Marian Resseguie was the sole insured under the policy. Her husband, who was listed as a driver under the policy but was not listed as the insured, orally requested the insurer to reduce UIM coverage from $50,000, the bodily injury liability limits, to $15,000. 980 F.2d at 228. Following the request, a secretary for Nationwide's agent wrote out a customer service request form reflecting Resseguie's husband's request. *Id.* In response to this form, Nationwide mailed Marian Resseguie a new declarations page reflecting the reduction and advised her that a credit for the reduction had been applied to the premium balance. *Id.* at 228-29. Marian Resseguie continued to pay the premiums reflecting the reduced UIM coverage for four years. *Id.* at

(continued...)

> [Section] 1734's language is plain and the Pennsylvania General Assembly's intention is clear. By its terms, a named insured may lower her statutorily provided UIM coverage limits by requesting in writing of her insurer to do so. The insurance company's obligation to issue a policy with UIM coverage in an amount equal to the policy's bodily liability coverage is not relieved unless it has received such a written request.

*Emig*, 664 A.2d at 563. Moreover, the Pennsylvania Superior Court has reaffirmed this principle. It has reiterated that if the request for lower limits is not made in writing, then "(1) the lower limits allegedly selected by the insured are a nullity; and (2) UM/UIM coverage is deemed to be equivalent to the bodily injury liability limits."[17] *Nationwide Mut. Ins. Co. v. Heintz*, 804 A.2d 1209, 1216 n.7 (Pa.Super. 2002) (citing *Emig*).

---

[16](...continued)
229. However, it was undisputed that Marian Resseguie never personally requested either orally or in writing, that Nationwide lower her UIM coverage. *Id.* It was also undisputed that she never authorized or directed her husband to do so. *Id.*

The husband was killed in an automobile accident with a drunk driver. *Id.* Marian Resseguie recovered the limits of the tortfeasor's liability policy; however, that recovery was insufficient to cover her losses or the estate's losses. *Id.* Therefore, she requested the higher UIM limits under the policy. Once Nationwide learned of her request, it initiated a declaratory judgment action in the District Court seeking a determination that her UIM coverage was limited to $15,000. *Id.*

The District Court found that the MVFRL statutory scheme is clear. It held: "Section 1734 requires the named insured to request in writing that the limits of her coverage be lowered. Short of a written request by Marian Resseguie for the lower coverage, . . . Nationwide simply was not authorized to alter her policy." 782 F.Supp. 292, 294 (M.D.Pa. 1992).

We agreed with this holding. However, because the precise issue had not been decided by the state's highest court, we had to predict whether the Pennsylvania Supreme Court, if it were deciding the case, would come to the same conclusion. We had no difficulty in predicting that it would. 980 F.2d at 231-32.

[17]Because Fire & Casualty never received a request in writing from the insured to reduce UM coverage to $35,000, it had no authority to issue the endorsement indicating that UM coverage was limited to $35,000.

Undeterred, Fire & Casualty presses on and cites language from a footnote from the Pennsylvania Supreme Court's decision in *Lewis*:

> Since our present reasoning concerns the non-applicability of the technical requirements of Section 1731(c.1) in a specific-limits paradigm, we do not consider the availability and extent of a remedy for an actual violation of the written-request requirement of Section 1734. We do note, however, that such prescription is less technical in nature, and more directly in line with the traditional application of ordinary contract principles in the consumer insurance area, that Section 1731(c.1)'s separate-page requirement.

*Lewis*, 793 A.3d at 155 n.17 (citations omitted). In Fire & Casualty's view, this footnote means that the District Court here could only "reform" the policy under traditional contract principles.

The argument is without merit for the reasons we have discussed. The District Court did not "reform" the policy at all. Indeed, Cook never asked for reformation. Cook simply asked the District Court to apply § 1734 to this policy and determine if Atlantic Express satisfied the statutorily prescribed method for reducing its coverage. It is clear that Schlenker never asked for reduced UM limits in writing as required by § 1734. That is all the District Court determined, and under § 1734 that is all it had to determine. The District Court simply enforced the contract as written.[18]

## VI.

---

[18]We must confess that we are somewhat hard-pressed to grasp the import of the Pennsylvania Supreme Court's footnote in *Lewis* because we find it difficult to understand how traditional contract principles apply when the issue is one of statutory compliance.

For all of the above reasons, we will affirm the District Court.[19]

---

[19]Fire & Casualty contends that the primary public policy behind the enactment of the MVFRL was one of cost-containment and that by enacting the MVFRL, the legislature sought to control the spiraling costs of automobile insurance. *See, e.g., Burstein v. Prudential Prop. & Cas. Ins. Co.*, 809 A.2d 204, 207 (Pa. 2002) (Nothing that "[w]hile . . . other public policies may underlie the MVFRL, the legislative concern for the spiraling consumer cost of automobile insurance is its dominant and overarching public policy.") (citation and internal quotations omitted). It then submits that when the District Court "erroneously reformed the policy," the District Court essentially gave Atlantic Express $965,000 in free UM coverage which will be passed on to all other insureds in the Commonwealth. Fire & Casualty's Br. at 57. In Fire & Casualty's view, this result "flies directly in the face of the public policy underlying the creation of the MVFRL." *Id*. at 57-58.

We are unpersuaded by this argument. As we have already held, the District Court did not reform the policy. Moreover, a similar public policy argument has been rejected by the Pennsylvania Superior Court. *See Emig*, 664 A.2d at 567-568.

Fire & Casualty Company of Connecticut v. Mason Cook, No. 04-2564

Weis, Circuit Judge, Dissenting.

This is an unusual case even in the context of the confusing and often inconsistent court rulings on the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa. C.S.A. § 1701 et seq. In this case, a fortuitous additional insured seeks to void a coverage declaration in an insurance policy. He relies on a formalistic ground that the named insured does not espouse but instead, apparently, opposes.

The case of the additional insured, Mason Cook, rests on two theories. First, he contends that the declaration in the policy accepted by the named insured, Atlantic Express Transportation Group, setting the limits for uninsured motorist coverage of $35,000 is ineffective. He argues that result obtains because in negotiations leading to the placement of the policy, Atlantic Express did not comply with section 1734 of the MVFRL, which allows a named insured to request reduced uninsured coverage. 75 Pa.C.S.A. § 1734.

Second, Cook argues, implicitly, that as an additional insured, he has standing to raise the issue of noncompliance by the named insured. I will address this contention first.

Atlantic Express is a sophisticated business enterprise that owns or leases approximately 5,800 vehicles in its nationwide fleet. Through its broker in New Jersey, Atlantic Express secured a policy from Fire & Casualty Company of Connecticut that was delivered to Atlantic Express' office in New York.[20] Before the broker placed the insurance, an Atlantic Express officer signed a printed application form indicating the desired coverages. The portion of the form dealing with the amount of underinsured coverage indicated that $35,000 was desired. Immediately above was another block for uninsured coverage. It was blank; the record does not disclose whether that was the result of a typographical error or oversight in the process of completing the form.

The policy as issued provided bodily injury liability coverage in the amount of $1 million. Included was a declaration referring to an

---

[20] Under Pennsylvania law, an insurance policy should be interpreted in accordance with the law of the state where the policy was delivered. Crawford v. Manhattan Life Ins. Co., 221 A.2d 877, 880-81 (Pa. Super. Ct. 2001). Because we sit in diversity, we apply the choice of law rules of the forum state. Shuder v. McDonald's Corp., 859 F.2d 266, 269 (3d Cir. 1988).

In this instance, the policy was delivered in New York which suggests that New York law should be consulted for our inquiry. However, both parties conclude that there is no significant difference between New York and Pennsylvania law on contract interpretation and construction.

Because both parties agree that application of the laws of New York and Pennsylvania would yield similar results, as the majority has done, I will focus my analysis on Pennsylvania's law. This is appropriate because a Pennsylvania statute is at issue.

26

endorsement setting uninsured coverage at $35,000. This policy was in effect on the date of Mr. Cook's accident.

Although the application form contained no information about inclusion of uninsured coverage, the District Court found as a fact that the parties, Atlantic Express and Fire & Casualty, intended uninsured coverage limits of $35,000 to be in effect. Fire Cas. Co. of Conn. v. Cook, 2004 WL 945138, at *3 (E.D. Pa. Apr. 29, 2004) (noting that "plaintiff has established that it was the insured's intention to request reduced UM coverage limits."). There is no dispute that the policy as written and delivered, conformed to Atlantic Express' desires and Fire & Casualty's understanding.[21]

Fire & Casualty argues that the correspondence between the broker and insurance carrier, before the policy was issued, was adequate to constitute a request for reduced coverage made by Atlantic Express in compliance with section 1734 of the MVFRL. 75 Pa.C.S.A. § 1734. Cook denies that those documents met the statutory requirement of a writing signed by the named insured; therefore, he argues that the coverage limits defaulted to the applicable bodily injury liability limits of $1 million.

---

[21]

In a deposition, the broker pointed out that if Atlantic Express had wanted its uninsured coverage to be the same as its liability limits of $1 million, an additional premium of $435,000 would have been required.

Cook does not have standing to challenge the alleged noncompliance of the named insured. He had nothing to do with the negotiations for the policy. He had nothing to say about the limits of the coverage and would not have been consulted if Atlantic Express decided to cease paying the premiums, or if it determined to cancel the policy in whole or in part. He had no knowledge of the parties' intent other than the policy declaration setting $35,000 as the limit for uninsured coverage. Cook's accident triggered his rights under the policy and those rights were defined by the written terms as they existed at that point.

The status of an additional insured differs from that of a named insured. As the Superior Court of Pennsylvania held,

> "an injured person who makes a claim for uninsured motorist benefits under a policy to which he is not a signatory is in the capacity of a third-party beneficiary . . . third-party beneficiaries are bound by the same limitations in the contract as the signatories of that contract. The third-party beneficiary cannot recover except under the terms and conditions of the contract from which he makes a claim."

General Accident Ins. Co. of American v. Sharp, 665 A.2d 502 (Pa. Super. Ct. 1995).

The Supreme Court of Pennsylvania expressed the same approach in Johnson v. Pennsylvania National Ins. Cos., 594 A.2d 296, 298 (Pa. 1991), concluding that an additional insured is "in the category of a third party beneficiary. Historically, this Court has held that third party beneficiaries are bound by the same limitations in the contract as the signatories of that contract." See also Been v. Empire Fire & Marine Ins. Co., 751 A.2d 238 (Pa. Super. Ct. 2000) (barring an additional insured's claim as a result of a rejection of coverage by the named insured.); Kimball v. Cigna Ins. Co., 660 A.2d 1386 (Pa. Super. Ct. 1995) (concluding that a daughter who was not a named insured at the time her mother requested reduced coverage but who subsequently became a named insured was bound by her mother's election).

Statutory requirements also affect the relationship between a named insured and an additional insured. Before 1990, insurance companies were required to provide uninsured coverage, but that mandate was changed to an option by amendments to the MVFRL. Act of Feb. 12, 1984, P.L. 26, No. 11, § 3, repealed by Act of Feb. 7, 1990, P.L. 11, No. 6. 75 Pa.C.S.A. § 1731(a) now requires only that insurers must "offer" uninsured coverage. "Purchase of uninsured motorist and underinsured motorist coverage is optional." 75 Pa.C.S.A. § 1731(a). As the Pennsylvania Supreme Court explained, the General Assembly's decision to make "the purchase of UM

29

and UIM coverage optional although insurers remained obligated to offer the coverage" was "designed to enhance the ability of insurers to control costs." Lewis v. Erie Insurance Exchange, 793 A.2d 143, 150-51 (Pa. 2002).

This statutory shift from mandated to optional coverage is the background against which the section 1734 "request in writing" provision must be read.

In Nationwide Ins. Co. v. Buffetta, 230 F.3d 634 (3d Cir. 2000), we noted the significant change in the MVFRL; we stated that "Section 1734 provides that 'a named insured <u>may</u> request in writing . . .'" reduction below the liability limits. <u>Id</u>. at 639 (emphasis in original). We also noted that

 "the statute, by its terms, does not <u>require</u> anything to be done by an insurer to permit the <u>reduction</u> in the amount of UIM coverage under a policy. . . . Unlike section 1731 [which applies to a complete rejection of coverage], section 1734 does <u>not</u> dictate that the opportunity for reduction, or a form to that effect be presented when a policy is issued. It merely provides that a reduction of this kind <u>may</u> be accomplished, but only by a writing which constitutes a request by a named insured."

<u>Id</u>. Further, we stated, "[t]he statute is written in permissive terms leaving it to a named insured who may request reduced coverage." <u>Id</u>. at 641.

30

Section 1734 does not use the word "shall" or "must," nor does the MVFRL state that in the absence of a writing, the insurer "must" issue uninsured coverage at the liability limits. The amendments to the MVFRL might have been more specifically drawn, but the optional nature of uninsured coverage is clear. The purpose of a writing is to protect both the named insured and the insurer against disputes about the uninsured coverage. A writing obviously could forestall debate over what coverage was desired or offered.

In this case, the intention of the parties to the policy is not disputed. It is inconsistent for the additional insured, a third-party beneficiary, to have the right to override the determination of what coverage the named insured wished to provide and pay for. To grant such power in the presence of opposition by the named insured gives the additional insured rights superior to those of the named insured.

The Supreme Court of Pennsylvania has a similar view in observing that the additional insured "has paid neither premiums nor any consideration for the benefits of this insurance policy. As such, it seems inequitable to permit [the additional insured] to pick and choose those contract provisions she prefers while not granting that same latitude to the named insured." Johnson, 594 A.2d at 299.

My research has not revealed any appellate case under the MVFRL that

31

extends standing to an additional insured to claim coverage for additional benefits despite a contrary position taken by the named insured. It is worth noting once again that section 1734 is directed only to the "named insured," not an additional insured. To require notice to, or consent by, an additional insured under a large fleet policy for coverage decisions made by the named insured would be impractical and undesirable.

In the cases relied upon by Cook, the challenge to compliance with the statute was made by the named insured. See Nationwide Ins. Co. v. Resseguie, 980 F.2d 226 (3d Cir. 1992); Motorists Ins. Cos. v. Emig, 664 A.2d 559 (Pa. Super. Ct. 1995); Hayes v. Harleysville Mutual Ins. Co., 841 A.2d 121 (Pa. Super. Ct. 2004). In those cases the named insured capitalized on mistakes made by the insurer or its agents, or relied on the lack of a signature by the named insured. That is not the case here.

Cook relies heavily on Peele v. Atlantic Express Transportation Group, Inc., 840 A.2d 1008 (Pa. Super. Ct. 2003). There, the court held that the word "statutory" used in a binder written by an insurance company meant that the limits of the uninsured/underinsured coverage were the same as those of the liability limits, rather than the lower limits intended by the named insured. Peele is distinguishable in several aspects. First, it involved a binder providing interim insurance that did not specify the monetary limits on

32

underinsured/uninsured coverage. That is a significant difference from the situation where a policy was issued, clearly stating the monetary limits. In Peele the accident occurred while the binder was in effect and had not yet been superseded by the policy. In this case, the policy had been delivered and was in effect before Cook's accident.

Moreover, the Peele Court did not discuss the fact that the named insured had not challenged the insurer's claim that lower limits of underinsured/uninsured coverage were desired. Peele also seemingly did not consider that the named insured was a large, highly sophisticated entity, and the negotiations for placement of a policy were quite unlike the purchase by average individuals.

I conclude that the stated limits of $35,000 in the policy apply to the dispute here and therefore the judgment of the District Court should be reversed.

As an alternate ground for reversal, I call attention to the Pennsylvania Supreme Court cases that held that there is no provision for reformation of a policy for certain violations of the MVFRL. See Salazar v. Allstate Ins. Co., 702 A.2d 1038 (Pa. 1997); Donnelly v. Bauer, 720 A.2d 447 (Pa. 1998).

In Salazar, the insurance company failed to give notice to the named insured upon renewal of the policy that her previous rejection of uninsured

33

coverage would continue. The Court held that section 1791.1 of the MVFRL required such notification, but provided no express remedy. Accordingly, the insurance company was not required to grant coverage to an additional insured. In the Court's view, the legislature had not provided any enforcement mechanism for noncompliance with the statute. Salazar, 702 A.2d at 1044.

Donnelly was concerned with a statutory notification of full tort and limited tort options under section 1791.1 of the MVFRL. Although the insureds had selected the limited tort option, they sought to obtain full tort benefits after an accident on the ground that the notice they had received was incomplete. The Pennsylvania Supreme Court concluded that the notice was not in accord with the statute, but that no remedy was available. Donnelly, 720 A.2d at 454.

The Court explained that its ruling was supported by the policy underlying the enactment of the MVFRL to "stem the rising cost of insurance. . . ." Id. In originally making their choice, the insureds received a "greater reduction in their premiums . . . . If this Court were to fashion a remedy not expressly provided for in the MVFRL, this Court would essentially contravene the cost containment policy behind the MVFRL because allowing [the insureds what] they seek would result in giving [them] something for which no individual has paid, which in turn, would result in insurance companies passing on this extra cost to all other insureds." Id.; see also Nationwide Mutual Ins. Co. v.

34

Heintz, 804 A.2d 1209 (Pa. Super. Ct. 2002) (concluding that there is no remedy for noncompliance with notice requirement of MVFRL section 1791).

In Lewis v. Erie Insurance Exchange, 793 A.2d 143 (Pa. 2002), the named insured and the additional insured contended that a request for reduced uninsured coverage had been improperly included on an "outright" rejection form. The Court concluded that no specific form for reducing coverage was required by the statute. Lewis, 793 A.2d at 155.

In Peele, the Court granted the additional insured coverage equivalent to that of the liability limits. The Court denied that it was "reforming" the policy, but was simply applying its terms. That is quite different from the situation here where the District Court changed the written term of the policy to substitute "$1 million for $35,000 coverage." That is reformation, not simply interpretation.

The Pennsylvania Supreme Court made clear in Salazar and Donnelly that in enacting the MVFRL the Pennsylvania legislature was concerned not only with providing the average insurance consumer adequate information to make an informed choice, but also with halting the spiraling insurance costs in the state that affect everyone. Neither of those objectives will be met in this case by a formalistic ruling which imposes terms on the named insured and the insurer which they never intended or agreed upon. The Lewis Court stated that

cost containment has been increasingly significant and the "General Assembly has been employing the vehicles of free consumer choice with greater latitude and frequency in furtherance of this objective." Lewis, 793 A.2d at 154. The majority's ruling here does not meet that aim.

I would reverse the Judgment of the District Court and enter Judgment in favor of the plaintiff.